[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 12-14421
_____

D.C. Docket No. 1:10-cv-00587-WS-M

JEFFERY LEE,

Petitioner-Appellant,

versus

COMMISSIONER, ALABAMA DEPARTMENT
OF CORRECTIONS,

Respondent-Appellee.
_____

Appeal from the United States District Court
for the Southern District of Alabama
_____

(August 1, 2013)

Before  TJOFLAT, DUBINA and HULL, Circuit Judges.

HULL, Circuit Judge:

Alabama death row inmate Jeffery Lee appeals the district court's denial of

his 28 U.S.C. § 2254 petition for a writ of habeas corpus.  As to his death sentence,

the Alabama appellate court held that: (1) Lee's trial counsel was not ineffective in

the investigation and presentation of mitigation evidence under <u>Strickland v. Washington</u>, 466 U.S. 668, 104 S. Ct. 2052 (1984); (2) the trial judge's override of the jury's life-sentence recommendation did not violate <u>Ring v. Arizona</u>, 536 U.S. 584, 122 S. Ct. 2428 (2002); and (3) the State's peremptory challenges did not violate <u>Batson v. Kentucky</u>, 476 U.S. 79, 106 S. Ct. 1712 (1986).  After review and oral argument, we affirm because the state courts' denial of Lee's claims was not contrary to or an unreasonable application of clearly established federal law under 28 U.S.C. § 2254(d).  Our opinion is organized as follows:

I.    GUILT PHASE
    A.    State's Evidence
    B.    Pretrial Mental Evaluations
    C.    Defense's Mental Health Evidence
    D.    State's Rebuttal Evidence

II.   PENALTY PHASE AND DIRECT APPEAL
    A.    Sentencing Hearing before Jury
    B.    Sentencing Hearings before Trial Judge
    C.    Lee's Direct Appeal and First Remand
    D.    Trial Judge's Amended Sentencing Order
    E.    State Appellate Court's Decision on Direct Appeal (<u>Lee I</u>)

III.  COLLATERAL REVIEW
    A.    Lee's Amended Rule 32 Petition and Supplement
    B.    State Trial Court's Rule 32 Decision
    C.    State Appellate Court's Rule 32 Decision (<u>Lee II</u>)
    D.    Lee's Federal § 2254 Petition

IV.   STANDARD OF REVIEW

V.    INEFFECTIVE-ASSISTANCE CLAIM
    A.    <u>Strickland v. Washington</u> Test

2

B.    Prejudice Prong

VI.    JURY-OVERRIDE CLAIM
    A.    Lee's Ring Claim
    B.    Direct Appeal Decision
    C.    Jury's Guilty Verdict Included Armed Robbery

VII.    LEE'S BATSON CLAIM
    A.    Batson and Its Progeny
    B.    Jury Selection in Lee's Trial
    C.    Direct Appeal Decision

VIII.    AEDPA DEFERENCE TO PLAIN-ERROR REVIEW

IX.    AEDPA DEFERENCE TO SUMMARY OPINIONS
    A.    Supreme Court Precedent
    B.    Our Circuit Precedent
    C.    Atwater v. Crosby (2006)
    D.    Hightower v. Terry (2006)
    E.    Blankenship v. Hall (2008)
    F.    McGahee v. Alabama Department of Corrections (2009)
    G.    Greene v. Upton (2011)
    H.    Adkins v. Warden, Holman CF (2013)

X.    BATSON ANALYSIS IN LEE'S CASE
    A.    Striking Pattern
    B.    Alleged Racial Discrimination History
    C.    Venire Member David Gutridge
    D.    Venire Member Demond Martin
    E.    Totality of the Evidence

XI.    CONCLUSION

## I. GUILT PHASE

On December 12, 1998, Petitioner Jeffery Lee shot and killed Jimmy Ellis

and Elaine Thompson and attempted to kill Helen King during an attempted armed

robbery of a pawn shop.

The murder charges against Lee were capital in nature because Lee: (1) committed the murders during a robbery or an attempted robbery, see Ala. Code § 13A-5-40(a)(2); and (2) murdered two or more persons by one act or pursuant to a single scheme or course of conduct, see id. § 13A-5-40(a)(10). Two capital murder counts charged the murders of Ellis and Thompson during a robbery, see id. § 13A-5-40(a)(2); a third capital murder count charged those two murders pursuant to a single course of conduct, see id. § 13A-5-40(a)(10); and a fourth count charged the attempted murder of King, see id. §§ 13A-6-2, 13A-4-2. As recounted below, the trial evidence of Lee's guilt was overwhelming.

## A.    State's Evidence

Critically, the State's evidence included: (1) the eyewitness testimony of the surviving victim King; (2) surveillance camera footage from the pawn shop which depicted the murders of Ellis and Thompson and the attempted murder of King; and (3) Lee's signed statement confessing to shooting the three victims and attempting to rob the pawn shop.[1]

---

[1]Pretrial, the state trial court held an evidentiary hearing concerning Lee's motion to suppress this statement to law enforcement confessing to the crimes and any physical evidence obtained in violation of Lee's constitutional rights. After taking the testimony of Lee and the law enforcement officer who took the statement, the state trial court denied Lee's motion to suppress. On direct appeal, the Alabama Court of Criminal Appeals affirmed the trial court's denial of Lee's motion to suppress. Lee v. State, 898 So. 2d 790, 833 (Ala. Crim. App. 2003).

4

On the day of the murders, Lee went into Jimmy's Pawn Shop in Orville, Alabama, under the guise of purchasing a wedding ring. Lee spoke with King, an employee of the pawn shop. Lee told King that he had no money with him and would return to the shop later with money to purchase a ring; Lee provided King with a fake name, Chris Williams. Lee left. The pawn shop's owner, Ellis, and another shop employee, Thompson, were also in the pawn shop at that time.

Not long thereafter, Lee reentered the pawn shop, this time armed with a sawed-off 12-gauge shotgun and said, "What's up, mother[]fuckers?" Without another word, Lee began firing. Lee shot Ellis in the left arm and then shot Thompson point-blank in the face. Next Lee turned the shotgun to King and shot her, hitting King's hand. King fell to the floor and pretended to be dead. Lee then shot Ellis again in the chest. After shooting the pawn shop's three occupants, Lee attempted to open the cash register but could not wrench it open. Lee left the pawn shop.

After Lee left, King got up, grabbed the telephone, and dialed emergency 911. While on the telephone, King locked the shop's doors. Lee had left his sawed-off shotgun, used in the murders, on the shop's counter. Lee attempted to reenter the shop but could not. Lee fled the scene, leaving a bloody trail in his wake: Ellis lay dead of multiple shotgun blasts, including a fatal shot to the chest; Thompson lay dead of a close-range shotgun blast to the face; and King was

5

wounded but still alive.

Lee had two associates who were waiting outside the pawn shop during the killings. Lee and his two associates fled the scene, visited briefly with family members, and then went to Newnan, Georgia, where they rented a motel room. While Lee's associates returned to Alabama later that day, Lee remained in the motel in Georgia. Law enforcement officers apprehended Lee in the early morning hours of the next day, December 13, 1998.

Shortly thereafter, Lee signed a written confession admitting that he shot the pawn shop occupants in an attempted robbery. In his written statement, Lee admitted that he and his two accomplices decided to rob the pawn shop; after looking at rings, Lee left but later returned with the sawed-off shotgun; and Lee entered the shop with the sawed-off shotgun and told the occupants it was a robbery. Lee said his first shot at Ellis was "fired accidentally," but otherwise Lee conceded that the rest were intentional. After shooting the victims, Lee attempted to open the shop's cash register but was unable to do so. Lee left. After realizing he had left the shotgun in the shop, Lee attempted to return to the shop to retrieve his weapon but the front door was closed.

At trial surviving victim King described the crimes and positively identified Lee as the perpetrator. King verified the pawn shop's surveillance footage corresponded to her recollection of events. The State introduced into evidence

6

several photographs of the victims.  Objecting, Lee's counsel argued that the photographs were highly inflammatory and prejudicial.  Also, well before trial, Lee's counsel filed a motion in limine to preclude the State from introducing "several gruesome and highly prejudicial photographs of the victims," photographs which depicted "[f]ull-body and close-up head shots of the victims."  The state trial court overruled the objection, and the photographs were admitted and exhibited to the jury.

The State also called the medical examiner who performed the autopsies on victims Ellis and Thompson.  The medical examiner testified that Ellis: (1) sustained shotgun wounds in his chest and left arm; and (2) died due to a large amount of abdominal bleeding and heart damage caused by the shotgun blasts.  As to Thompson, the medical examiner testified that Thompson died from a close-range shotgun blast to the face.  The jury heard the medical examiner describe Thompson's wound as follows: the shotgun pellets "shattered [her] facial bones creating a large fracture across the floor of the inside of the skull where her brain resides and also tore greatly the frontal lobes of this lady, areas of the brain in front."

On cross-examination, Lee's counsel questioned the medical examiner as to whether he could determine if the shooting was accidental or intentional.  The medical examiner responded that he could not make that determination; he could

7

state only that the shotgun wounds were not self-inflicted injuries and the shots were fired from a "sufficient range that [he] classified it as homicide."

The State also called Maurice Cunningham, Lee's sister's boyfriend. Cunningham was with Lee the night before the murders along with a larger group, first at Cunningham's house and later at a club. Cunningham testified that a gun was present at some point during his evening with Lee, and that Cunningham tested the gun "to see how it shot." Cunningham did not know who brought the gun or who left with the gun. Cunningham identified the sawed-off shotgun recovered from the pawn shop as the one he test-shot the night before the murders.

Lieutenant Roy Freine of the Dallas County Sheriff's Department testified that he was one of the officers to pick up Lee in Newnan, Georgia, the day after the murders. After obtaining a waiver of Lee's Miranda rights, Lt. Freine interviewed Lee and took a written statement. Lee's signed written statement, confessing to the crimes, was admitted into evidence. Lt. Freine read the statement aloud, in which Lee admitted to attempting to rob the pawn shop and shooting the victims, although Lee claimed in the statement that the first shot fired at Ellis was accidental.

Through Lt. Freine's testimony, the State also introduced into evidence and played for the jury the surveillance footage from the pawn shop which recorded the murders on December 12, 1998.

8

On cross-examination of Lt. Freine, Lee's counsel elicited testimony implying that despite the many objects of value in the pawn shop, including $900 in victim Ellis's pocket, none of these items were taken by Lee.

## B.    Pretrial Mental Evaluations

Prior to trial, Lee's trial counsel[2] had the benefit of three mental health evaluations: (1) Dr. Winston Pineda at the jail; (2) the court-appointed expert Dr. Kathy Ronan; and (3) the defense's retained expert Dr. Donald Blanton.  Lee called Dr. Blanton as a witness in the guilt phase and the State called Dr. Ronan in rebuttal.  We review their evaluations of Lee.  Although neither party called Dr. Pineda, we also review the evidence concerning his evaluation of Lee.

### 1.    Dr. Kathy Ronan

At the State's request, the state trial court ordered a mental evaluation of Lee.  On July 20, 1999, clinical psychologist Dr. Kathy Ronan evaluated: (1) Lee's present mental condition and competency to stand trial; and (2) Lee's mental condition at the time of the murders.

In her August 11, 1999 report, filed in the state trial court in September 1999, Dr. Ronan recounted Lee's family background.  Prior to his incarceration,

---

[2]The state trial court appointed criminal defense attorneys Michael Jackson and Joseph Hagood III to represent Lee.  Lead counsel Jackson was an experienced criminal law attorney, who worked several years as a prosecutor in a district attorney's office in Alabama, and then as a criminal defense attorney in private practice for five years.

9

Lee lived with his family, and had two sisters, three half-brothers, and one half-sister. Lee told Dr. Ronan that he was "mentally abused" by his mother, and that he was cursed and all his life told he "ain't gonna amount to nothing." But Lee "denied any physical or sexual abuse, or any significant difficulties while growing up."

As for physical or mental health problems, Lee reported that he once suffered a head injury that knocked him unconscious and necessitated a hospital visit, although he was not sure if he had sustained a concussion. Lee denied any other medical problems. Lee said that he had never received psychiatric services until after his incarceration for these murders.

As to mental capacity, Dr. Ronan observed that Lee exhibited "a few areas of below normal functioning . . . but no significant deficits." Lee's test results "suggested that his overall intellect is probably within the low average to perhaps borderline range," but Dr. Ronan found "no indication of retardation." Dr. Ronan also recounted how Lee had a "fairly significant history of substance abuse, including Marijuana Dependence; Alcohol Dependence; and Cocaine Dependence."

Ultimately, Dr. Ronan concluded that Lee was competent to stand trial, as Lee did not "have any type of major psychiatric illness," "[t]here is no indication of retardation," and Lee "demonstrated adequate knowledge in all areas assessed

10

related to legal proceedings."

Dr. Ronan also evaluated Lee's mental state at the time of the murders. Lee told Dr. Ronan that immediately prior to the murders, he smoked "a blunt" of marijuana laced with cocaine and consumed a half pint of whiskey. Lee said that earlier that same day: (1) his head was burning and when he awoke that morning, he saw what he believed was a dead woman dressed in white who attempted to wake him; and (2) he smoked a joint of marijuana. Other than those reported facts, Dr. Ronan found "no indication that [Lee] had any type of command hallucinations or delusions directing him to be engaged in the behaviors related to the alleged offense." Accordingly, Dr. Ronan's opinion was that "there were no significant mental illness symptoms which interfered with [Lee's] ability to appreciate the consequences of his actions during the time of the alleged offense" and any "substance induced perceptual anomalies . . . did not interfere with his ability to understand right from wrong during the time of the alleged crime."

### 2.    Dr. Donald Blanton

On September 20, 1999, after receiving Dr. Ronan's report and certain school records, Lee's counsel moved for the appointment of and $5,000 in funds to hire a clinical neuropsychologist who would interview, test, evaluate, and present trial testimony regarding Lee. Defense counsel asserted that an expert was necessary to assist counsel in determining and presenting mitigation evidence,

11

including but not limited to "the fact that this Defendant has, through his life, functioned with very limited intellectual ability. . . . [and] other factors relating to his traumatic upbringing and mental impairments . . . which constitute mitigating circumstances." Lee's counsel specifically recognized that "[m]ental impairment is the most compelling mitigating factor[]."

After the state trial court granted this motion, Lee's counsel hired Dr. Donald Blanton to evaluate Lee.

Dr. Donald Blanton has a Ph.D. in counseling and educational psychology and is an experienced psychometrist with expertise in administering psychological and educational tests. Dr. Blanton consulted with Lee on October 29, 1999, and conducted his evaluation of Lee on March 31, 2000.

Dr. Blanton performed a number of psychological tests on Lee. Dr. Blanton first gave Lee the full Wechsler Adult Intelligence Scale, Revised ("WAIS-R"). Lee scored an IQ of 67, which indicated to Dr. Blanton that Lee was "in the middle range of mental retardation." Dr. Blanton administered the Bender Visual-Motor Gestalt Test, on which Lee did "fine." Dr. Blanton also administered the Wide Range Achievement Test-Rephrased III, a reading, spelling, and arithmetic test, on which Lee scored at the sixth grade level in reading, the second grade level in spelling, and the second grade level in arithmetic.

Dr. Blanton concluded that Lee "was not psychotic and that he was having

12

some depression secondary to his situation." In his report, Dr. Blanton stated that "[t]hroughout testing [Lee] appeared to put good effort into his work and anxiety did not appear to be a significant factor."

As for Lee's substance abuse history, Dr. Blanton said that Lee admitted to him that he used marijuana on a daily basis and cocaine on a weekly basis. Dr. Blanton's report noted that Lee's mother and father both allegedly suffered from "nervous trouble" and had been treated for "nerves." Additionally, Lee's "[f]amily history . . . reveal[ed] a drug addicted uncle and another alcoholic uncle."

### 3.    Dr. Winston Pineda

Although not called at trial, we review what the record states about Dr. Pineda's evaluation of Lee. Following his arrest, Lee was evaluated by Dr. Pineda, a psychiatrist working for the State, on January 7, 1999. Dr. Pineda's evaluation and treatment are referenced in Dr. Ronan's report, which both the state trial court and Lee's counsel had.

Dr. Pineda reported that, during his consultation, Lee complained of "persecutory auditory hallucinations" starting immediately before the murders and that Lee was "quite distraught and remorseful." Dr. Pineda stated that Lee had an unspecified psychiatric disorder, as well as a dependence on marijuana. Dr. Pineda prescribed for Lee in jail certain anti-psychotic medications, including Zyprexa, Navane, and Congentin.

13

## C.    Defense's Mental Health Evidence

After the State rested its case in the guilt phase, the defense called Dr. Donald Blanton as its sole witness in the guilt phase.  The defense offered Dr. Blanton as a "certified psychometrist."[3]

Dr. Blanton recounted his findings from his March 31, 2000 evaluation of Lee and battery of tests.  Dr. Blanton testified that Lee scored an IQ of 67 on the WAIS-R, a score "in the middle range of mental retardation which is slightly below the second percentile nationally."  Dr. Blanton stated that meant "out of 100 people, 98 would have a higher I.Q. score than Mr. Lee on average nation[]wide."

Dr. Blanton also administered the Bender Visual-Motor Gestalt Test, a test performed to determine any "organic disturbances" between Lee's "eyeballs and brain hookup."  On that test Lee did "fine."

Dr. Blanton also testified to Lee's results on the Wide Range Achievement Test-Rephrased III, on which Lee scored at the sixth grade level in reading, the second grade level in arithmetic, and the second grade level in spelling.  Dr. Blanton explained that Lee's reading score indicated that "92 percent of people score better than what [Lee] had [scored] on his test."  As for Lee's arithmetic

---

[3]The State objected to the expert testimony of Dr. Blanton as immaterial.  In response, Lee's counsel emphasized that the defense sought to introduce Dr. Blanton's testimony to "talk about his mental retardation" and to address "whether [Lee] knowingly gave the statement" to police.  The state trial court overruled the State's objection.

14

score, Dr. Blanton stated it was "very low.  That would mean that 99.7 percent of the people would score higher" than Lee on the same test.

As for Lee's significant substance abuse history, Dr. Blanton testified that Lee admitted to him that he had used marijuana on a daily basis for years, cocaine on a weekly basis, and drank alcohol "quite often too."

Dr. Blanton also testified that he performed "a number of other tests that [Lee] was unable to handle."  Dr. Blanton gave Lee the Beck Depression Inventory and Mental Status Examination "which is a psychological test that's administered orally."  From that test Dr. Blanton concluded that Lee "was not psychotic and that he was having some depression secondary to his situation."  Dr. Blanton testified, though, that he did not believe Lee was malingering: "In this case, I didn't feel [Lee] understood whether it would hurt him or not hurt him [to be deceptive in answering the questions]."

On cross-examination, the State elicited testimony from Dr. Blanton that individuals in the "mild range of mental retardation" can function in society, and Dr. Blanton agreed to the prosecutor's statement that these individuals can "[h]ave families, jobs, go to work, drive trucks, and that sort of thing."  But Dr. Blanton stated that "[l]ess than four percent" of the general population would fit into the mildly retarded category.  The State also asked whether Lee would be able to perform well in school, to which Dr. Blanton replied that it "[d]epend[ed] on the

15

school."[4]

## D.    State's Rebuttal Evidence

In its rebuttal presentation, the State called Lee's work supervisor, Howard Mitchell, at Taylor Lumber Company.  Mitchell testified that Lee had worked for him for "a period of time," and Mitchell found Lee a capable and responsible employee with no problems following any instructions.[5]

The State next called Van Smith, the principal of Lee's high school, Billingsley High School.  Principal Smith described Lee as "a good student." Principal Smith said that the high school had three levels of classes: special education, basic level, and advanced track; Lee was "in the advanced track preparing for college."  Lee was not in special education and "was never tested for special education."  During his time at Billingsley, Lee maintained "average grades, Bs and Cs. . . . [j]ust an average student in that particular level."  Lee began encountering problems around the eleventh grade, when "[h]is grades turned down," and Lee's twelfth grade year was "pretty much the worst year."  Lee did

---

[4]Based on Dr. Blanton's testimony about Lee's mental capacity and Lee's written confession that the first shot was accidental, Lee's counsel asked for jury instructions on "lesser included charges of manslaughter and criminally negligent homicide."  The State objected. Ultimately the state trial court agreed to give: (1) a lesser-included manslaughter charge as to the capital murder of Jimmy Ellis, Count 1; and (2) a lesser-included charge of assault in the second degree as to the fourth count charging the attempted murder of Helen King.

[5]Mitchell testified that while he did hire "a lot of special ed people," Lee was not hired as such.

16

not complete high school, although he did take and pass the high school graduation exam in his eleventh grade year. On cross-examination, defense counsel showed Lee's SAT test and Smith agreed that Lee's scores were "somewhat low."

On redirect examination, the State showed Principal Smith a number of Lee's school records. These school records indicated Lee had grades of 90, 60, 90, 85, and 87 in ninth grade, and grades of 90, 68, 81, 69, 68, and 86 in eleventh grade.

In recross-examination, Lee's counsel confirmed with Principal Smith that Lee had been a high school senior in 1995, and that Smith had had no contact with Lee since then and no knowledge of Lee's substance abuse or whether something else may have impacted Lee's mental abilities.

The State then called Dr. Kathy Ronan, the clinical psychologist who had evaluated Lee. Dr. Ronan testified to her conclusion that Lee suffered from "no mental illness or mental retardation that would have impaired his understanding of right or wrong during the time of questioning."

Prior to her trial testimony, Dr. Ronan reviewed Dr. Blanton's report. Dr. Ronan agreed with some aspects of Dr. Blanton's report but disagreed with others. Dr. Ronan stated that Dr. Blanton's test results—which measured Lee's intelligence and achievement ability—"were quite low, and they were inconsistent with my original findings. They were also inconsistent with the history of Mr.

17

Lee's academic performance." Dr. Ronan stated that the inconsistencies could be attributed to two possibilities: (1) Lee was depressed when Dr. Blanton saw him—suffering from what she termed "an adjustment reaction" to incarceration—and that depression may have impacted Lee's testing ability; or (2) malingering.

Dr. Ronan also testified that even a mildly mentally retarded person's condition is "[n]ot so great as to interfere with [his] decision making process or ability to understand right from wrong." She explained that "when you're talking about [a] mental retardation level that interferes with some people to distinguish between right and wrong, you're really talking about an I.Q. level of in the forties, we call that moderate to se[vere] . . . retardation." And here, it was Dr. Ronan's opinion that Lee did not suffer from retardation of any kind.

On cross-examination, Dr. Ronan admitted that her examination of Lee lasted for an hour and a half to two hours and that she did not give Lee the entire WAIS-R test that Dr. Blanton gave Lee. Dr. Ronan also confirmed that Lee had told her that on the day of the crimes, his head was burning and he saw "a dead woman dressed in white" who was trying to wake him up. Dr. Ronan agreed that drugs might affect a person's decision-making ability.

Ultimately, the jury returned a unanimous verdict of guilty against Lee on all counts.

## II. PENALTY PHASE AND DIRECT APPEAL

18

A.    **Sentencing Hearing before Jury**

In his opening statement in the penalty phase, Lee's counsel said that counsel would "put on evidence to give you a better picture of Jeff[er]y Lee" and "why he shouldn't die."  Counsel said this "better picture" would include Lee's young age (23), his status as a father of two children, and things the jury had "already heard" including Lee's good work record and good school record.  Counsel also said the defense would talk about Lee's mental retardation, although the defense would not recall Dr. Blanton.

The State put forth no evidence, resting upon the guilt-phase evidence.

In Lee's mitigation presentation, Lee's counsel first invoked Dr. Blanton's guilt-phase testimony concerning Lee's mental capabilities and Howard Mitchell's guilt-phase testimony concerning Lee's status as a good worker.  The defense then called Lee's father, uncle, aunt, and mother.

Lee's father, Jessie James Lee,[6] testified that his son was 23 years old and the third of six children.  Jessie testified that "all [his] other children except [Lee] and one of [his] other boys have had seizures," and that often Jessie had to take them to "Birmingham at Saint Vincent," a hospital.

---

[6]The record is not clear as to Lee's father's name.  In the trial transcript Lee's father is called Lewis Lee.  Later, in the sentencing hearing transcript and in the presentence report, Lee's father is identified as Jessie James Lee.  For purposes of this appeal, we assume Lee's father's name is Jessie James Lee.

19

Jessie said that he was a mechanic and also worked for the State of Alabama. Jessie testified that Lee was "good help" until he entered ninth or tenth grade and began experimenting with drugs. Specifically, Jessie "would tell [Lee] to get [him] such and such a wrench and when [Lee] would come back, [Lee] would have the wrong wrench." After Lee began using drugs, Jessie said that Lee "just wasn't the same," and that Lee "would get in his bed and go to sleep and just sleep, sleep, sleep or either go out there where I worked on cars and just sit out there. Just sit." Jessie said Lee would "just sit" outside until "[t]en or eleven o'clock at night."

Jessie testified that Lee exhibited other strange behavior, and as an example stated that once Lee painted a dog. Jessie also said that "you could tell [Lee] not to do something and sometimes he would do it." Other times, "[Jessie] would tell him to do something and [Lee] wouldn't do it."

Lee's counsel asked Jessie if his son should receive the death penalty. Jessie expressed sympathy for the victims' families, but stated, "I don't want my son to go to no death penalty. I'm the one, I'm the one that carried my son to jail." Jessie testified that Lee wanted to turn himself in for the murders. He asked that his son's life be spared, and stated that his son "really need[s] help."

On cross-examination, the State confirmed with Jessie that Lee's problems began in ninth or tenth grade and that by Lee's senior year of high school, Lee had stopped attending. Jessie also testified that Lee "probably used to get in fights with

20

children . . . , but that's normal for children, I guess."

Jessie said that Lee stayed with Jessie and his wife (Lee's mother) during the week. The State asked Jessie whether he thought Lee had used drugs on the day of the crimes. Jessie responded: "It had to be something the matter with him because my children would come home every night. The night this happened, they didn't come home. My other son, Andre . . . who was in the car with him, he had called my daughter that morning about eight o'clock to come pick him up." When pressed as to whether Lee was on drugs at the time, Jessie responded, "When I s[aw] [Lee] that evening, he didn't look nothing like right."

Lee's uncle, Walter Jackson Lee, testified that he had been around Lee throughout Lee's life. Walter described Lee as "kind of a smart child" growing up and an "average child" who did not always "do everything he was supposed to do." Walter stated Lee should not receive the death penalty: "To me and especially to the family, . . . I wouldn't like to see him getting the death row. To the family, I'm sorry what he done. But I wouldn't like to see him get death row."

Lee's aunt, Emmajean Thomas, testified that she had known Lee "ever since he was a baby." Thomas said that growing up, Lee "was a good child. Not saying it because he's my nephew, but I'm saying it because it's true." When asked if she ever noticed anything unusual about Lee, Thomas responded, "No more than they used to like, like my brother said, like to play with dogs. [Lee] went and painted a

21

dog." She confirmed that Lee painted the dog "brown" and "[p]ainted the whole dog." Thomas testified that she knew of Lee's drug problems, and recalled that one time the sheriff was called and apparently found marijuana on Lee. Similarly to the other witnesses, Thomas testified that she sympathized with the victims' families but that Lee should not receive the death penalty.

Finally, Lee's mother, Betty Jean Lee, testified that while she had sympathy for the victims and their families, "I don't want to lose my child. I love him . . . . [H]e's my third son . . . and I don't want to lose him." Betty also noted that Lee had two children of his own, aged eight months and one year, respectively, and apparently with different mothers.

After closing arguments, the state trial court instructed the jury. The state trial court instructed on one aggravating circumstance: that the capital offense at issue was committed while Lee "was engaged in the commission of an attempt to commit flight after committing or attempting to commit robbery." The state trial court also instructed that "[t]he fact that Jeff[er]y Lee has been convicted in this case in and of itself is not an aggravating circumstance."

The jury returned a recommendation, by a vote of seven to five, that Lee be sentenced to a term of life imprisonment without parole.

## B.    Sentencing Hearings before Trial Judge

The same state trial judge commenced the first sentencing hearing on

22

September 22, 2000.[7]  The state trial court took additional testimony from the victims' family members and friends, from the surviving victim King, and from Lee's family members.

The victims' children testified.  Jimmy Ellis, Jr., victim Jimmy Ellis's son, testified that his father's death "tore [his] world apart," and the community remained outraged by the crimes.  Similarly, Telena Thompson, victim Elaine Thompson's daughter, testified that her mother's death "pretty much turned [her] personal life upside down," her mother had been her "very best friend," and that she suffered nightmares as a consequence of her mother's murder.

Surviving victim Helen King testified that: "I still can't sleep at night.  I slap at my kids for no reason.  I blame my husband for everything because he's the same color [as Lee].[8]  I'm not trying to be prejudiced because I'm not.  But it turned my life upside down."  King moved away from that community because she felt unsafe.

Larry Nichols, a manager of a service station across the street from victim

_____

[7]The State of Alabama employs three phases for the trial and sentencing of persons charged with capital offenses: (1) the guilt phase; (2) the penalty phase, during which the jury issues an advisory sentencing verdict based on its evaluation of aggravating and mitigating circumstances, see Ala. Code § 13A-5-46; and (3) a final phase at which time the trial judge orders and receives a presentence report, takes further argument, and may receive additional evidence concerning the aggravating and mitigating factors.  Thereafter, the trial judge must enter written findings as to these factors and impose a sentence. See id. § 13A-5-47; see also Boyd v. Allen, 592 F.3d 1274, 1284 (11th Cir. 2010).

[8]King is white and her husband is black.

23

Ellis's pawn shop, testified that he was a lifelong friend of Ellis and that Ellis was well-liked in that community.  Nichols said the community remained frightened and angry in the wake of the crimes.

The State played a small portion of the pawn shop surveillance tape showing Lee entering the pawn shop and shooting Ellis, Thompson, and King.

After the State's presentation, the defense presented additional testimony from Lee's family members.

Lee's father, Jessie James Lee, testified that Lee was one of six children and a young father to two children of his own.  Jessie stated that Lee was a good worker.  He also stated that: "[W]hen [Lee] was small, when he got to be 12 or 13 or 14 years old, he was one of the smartest and best children I had.  Some[]times I thought he was too smart.  But after he got up to around the eighth or ninth or tenth grade, [Lee] started failing, acting funny."  Lee's counsel confirmed with Jessie that he meant Lee began acting funny "mentally."  Jessie said that his son was on medication.  On cross-examination, Jessie stated that:

> What I mean about acting funny, [Lee] would stay in the house watching television.  I'm a pretty good mechanic and I worked on automobiles and he would sit over there by himself while I worked until about eleven or twelve o'clock out by himself.  I would ask him what was wrong.  He never would say anything, but he would sit out there where I have worked on cars by himself.

Jessie said he did not know if Lee began running with a bad crowd but that he

24

knew Lee had "started messing with some dope." However, Jessie said Lee did not get in trouble with the law, and the only problem Jessie could recall was "a little argument or fight at a club one night."

Jessie also testified about how his son's troubles had impacted him:

Since my boy got in trouble, see, I had to take an early retirement on account of stress and worry. I had a heart attack and I liked to passed myself. I had a good job, I worked for the State of Alabama a long time. I had to take an early retirement because I had a heart attack.

Lee's mother, Betty Jean Lee, testified that she was the grandmother of Lee's children, she loved her son Lee very much, and if Lee were given the death penalty, "[i]t would be hard." Lee's mother acknowledged that what Lee had done was wrong.

Another of Lee's uncles, Henry Lanier, Sr., testified that: he was around Lee his entire life; Lee was a good worker when he worked; and Lee started having problems when he got older: "[h]e just wasn't the same kid he was." Lanier stated he loved Lee and that if Lee received the death penalty, "[i]t would hurt a lot."

After some arguments by the attorneys, the state trial court stated it would consider the presentence investigation report and the evidence from the hearing and render a decision on October 11, 2000.

The Alabama Board of Pardons and Paroles prepared a presentence investigation report, which recounted Lee's background as the third child of seven

25

born to Jessie James Lee and Betty J. Lee, and Lee was raised in a home with both biological parents.  The report stated that "Lee denied childhood history of physical, emotional [or] sexual abuse" and "denied any specific family history of psychological treatment."  Lee admitted that he started using marijuana at age 16 and regularly drank alcohol.

The presentence report also reflected that Lee's parents provided a number of character references for Lee, including two pastors who indicated Lee attended church services and had been a respectable child.

On October 11, 2000, the state trial court conducted its second sentencing hearing.  At that hearing, Lee's counsel objected that the presentence report did not reflect: (1) Lee's current medications, including Zyprexa, Navane, Cogentin, and Remeron; and (2) that Lee was "presently under Doctor Pineda's care who diagnosed the Defendant as Borderline Mentally Retarded."  The state trial court indicated it would consider the things counsel listed.

After allowing the State and defense to make further arguments, the state trial court asked Lee if he would like to say anything "as to why the sentence of this court should not be pronounced against you."  Lee stated: "I would like to say I truly am sorry for what happened.  I would like to say to the victims of the family, I'm really sorry.  I didn't mean to do all that.  I know it's bad.  I truly am sorry.  That's all I can say."

26

The state trial court announced on the record its judgment that Lee be sentenced to death for his crimes.  The trial court carefully reasoned as follows:

> I have considered this case and this is the hardest one I've ever had to do.  I've had many.  I think it has been foremost in my mind since we were here two weeks ago.
> . . . .
> With that, I will read my conclusions.  With cold precision and premeditation using a weapon designed for the sole purpose of extinguishing human life [Lee] mercilessly gun[ned] down three people who were doing nothing more than trying to earn a living.  As shown individually by surveillance video he opened fire upon entering the door.  He emptied his weapon firing as quickly as he could, shot after shot.  Miraculously Helen King was spared and he only snuffed out the lives of two[, and] yet, in those few seconds of mayhem, he destroyed the lives of many.
> The Court has giv[en] full measure and weight to the aggravating circumstance and the statutory and non-statutory mitigating circumstances.
> The Court has further given due consideration to the jury's recommendation and the fact that life without parole is recommended by the minimum margin for a verdict.
> Based on all that, I find that the aggravating circumstance outweighs the mitigating circumstances.  Therefore, it is the judg[]ment of the Court that the defendant be punished by death for the capital offenses for which he was convicted.  He is further sentenced to life in prison for the attempted murder of Helen King.

In an accompanying written order, the trial court explained that the only statutory aggravating factor proven beyond a reasonable doubt was that set forth in Alabama Code § 13A-5-49(4), inasmuch as Lee had committed the capital offenses while engaged in an attempt to commit robbery.  The trial court also considered each of seven statutory mitigating factors, finding only two existed in Lee's case,

27

the defendant's: (1) lack of criminal history; and (2) young age (21) at the time of the crimes.

In its order, the state trial court also considered Lee's evidence of non-statutory mitigating circumstances, including Lee's: (1) limited mental capacity; (2) status as a father of two small children; (3) cooperation with law enforcement; (4) post-capture remorse for the crimes; (5) status as a good employee; and (6) family's love and support. After consideration of the aggravating circumstance and the statutory and non-statutory mitigating circumstances, and after due consideration of the jury's recommendation of life without parole by a seven to five vote, the trial court concluded "that the aggravating circumstance outweigh[ed] the mitigating circumstances" and sentenced Lee to death for the three capital murder convictions. The trial court sentenced Lee to life in prison for the attempted murder of King.

## C.    Lee's Direct Appeal and First Remand

Bryan Stevenson, an experienced capital defense attorney with the Equal Justice Initiative of Alabama, handled Lee's direct appeal of his convictions and sentences to the Alabama Court of Criminal Appeals (the "state appellate court"). Stevenson, with the help of another Equal Justice Initiative attorney, Angie Setzer, filed a 161-page appellate brief raising more than 30 grounds for relief. One ground asserted that the state trial court's sentencing order failed to comply with

28

Ex parte Taylor, 808 So. 2d 1215 (Ala. 2001).

Before addressing other issues, the state appellate court agreed and remanded the case so the state trial court could amend its sentencing order and delineate the specific reasons it gave the jury's recommendation the consideration it did as required by Taylor. Lee v. State, 898 So. 2d 798, 808 (Ala. Crim. App. 2003) ("Lee I") (opinion on return to remand).

## D.    Trial Judge's Amended Sentencing Order

On remand, the state trial court entered an amended sentencing order on October 31, 2001. In that order, the trial court stated that its "sentencing order entered October 11, 2000, shall remain in full force and effect as if set out fully herein." The state trial court amended that order to "provide the specific reasons for giving the jury's recommendation the consideration it did," including:

(1) "The Court is and was extremely mindful of the jury's recommendation in this case. The Court considered the fact that the vote was seven for life without parole and five for the death penalty, the minimum vote for a life without parole recommendation."

(2) "It appeared clearly to the Court that the aggravating circumstance outweighed the mitigating circumstances beyond a reasonable doubt. It is the Court's opinion that the advisory verdict of the jury should not be followed."

(3) Lee, "with cold precision and premeditation, using a weapon designed

29

for the sole purpose of extinguishing human life, mercilessly gunned down 3 people who were doing nothing more than trying to earn a living."

(4) "As vividly shown by the surveillance video, [Lee] opened fire upon entering the door. He emptied his weapon, firing as quickly as he could, shot after shot. Miraculously Helen King was spared and he only snuffed out the lives of two yet, in those few seconds of mayhem, he destroyed the lives of many."

(5) Lee "planned his crime. He went to the store earlier in the day and pretended to shop for a ring. Instead, he was looking it over with an eye to return to commit his crime."

(6) When Lee returned, "he fired immediately upon entering, with no warning and no questions asked. His intent was obvious; to take out the victims and steal what he could."

The state trial court concluded that Lee's "case deserves the death penalty," and noted that it had compared Lee's actions and the surrounding facts to similar cases, and that the sentence was proportionate to sentences in other capital convictions in Alabama for commission of murder during a robbery.

## E.    State Appellate Court's Decision on Direct Appeal (Lee I)

In his direct appeal, Lee challenged the state trial court's override of the jury's life recommendation as violating Ring v. Arizona. After jury selection, Lee had made a motion under Batson v. Kentucky challenging the prosecutor's strikes

30

of black venire members during jury selection.  The state trial court denied Lee's

Batson motion, and Lee also raised Batson issues in his direct appeal.

In an 84-page published opinion, the state appellate court affirmed Lee's

convictions and sentences, expressly rejecting Lee's Ring and Batson claims.  See

Lee I, 898 So. 2d at 874.  Later on, when we discuss these issues, we review the

state appellate court's decision in depth.

In a summary, two-sentence order, the Alabama Supreme Court denied

Lee's petition for a writ of certiorari, which raised Ring and Batson claims too.  Ex

parte Lee, 898 So. 2d 874 (Ala. 2004).  The United States Supreme Court denied

Lee's certiorari petition.  Lee v. Alabama, 543 U.S. 924, 125 S. Ct. 309 (2004).

### III. COLLATERAL REVIEW

A.    **Lee's Amended Rule 32 Petition and Supplement**

After Lee's direct appeal, his appellate counsel Stevenson withdrew, and

attorneys from the law firm Perkins Coie represented Lee in the state collateral

proceedings.  Lee's new counsel filed a petition for relief from judgment and

sentence pursuant to Rule 32 of the Alabama Rules of Criminal Procedure.  Lee's

amended Rule 32 petition claimed, inter alia, that his trial counsel provided

ineffective assistance by failing to investigate and present mitigation in the penalty

phase regarding: (1) his heavy use of drugs and alcohol on the night and day before

the crime; (2) his lack of sleep on that day; (3) his being upset on the day of the

31

crime upon learning his girlfriend (pregnant by Lee) had spent the night with another man; (4) his fathering a child at a young age with a second child on the way; (5) his extreme poverty and the emotional abuse that shaped Lee's life; (6) his mental health issues; (7) his long history of alcohol and drug abuse; (8) his "attempt[s] to lead a positive life," by being a hard worker, providing some financial support to his son and other family, and the fact that he "prioritized his son's needs, delaying going out with friends on the night before the crime in order to buy diapers for his son as he had promised"; and (9) Dr. Pineda's diagnosis of Lee in jail as having some type of psychosis and his prescribing Lee anti-psychotic medications in the jail. Lee also faulted his attorneys for not hiring a neuropsychiatric expert or an investigator.

Subsequently, Lee's counsel submitted an unverified supplement to that amended Rule 32 petition that focused more on three "new" mitigating factors: (1) Lee came from a poor, broken home in which his parents fought constantly; (2) he was addicted to sniffing gasoline starting at a young age; and (3) he may have suffered a head injury caused by a collision with an 18-wheeler. According to the supplement, Lee was knocked unconscious, had broken teeth, was transported to the hospital, had his head injury stitched, and was released four or five hours later. After the accident, Lee slept a great deal, lost interest in activities he once enjoyed, became easily angered and irritable, and began failing school.

32

"Despite his serious drug habit," the supplement alleged, Lee "made an effort to maintain employment to support his child and the one on the way [by his girlfriend]." Lee also said, though, that the pressure of being a father drove Lee to drink and use drugs more often.

## B.    State Trial Court's Rule 32 Decision

The state circuit court (the "Rule 32 court") denied Lee's amended Rule 32 petition. Having presided at Lee's trial, the Rule 32 court found "the evidence of Lee's guilt was overwhelming." The Rule 32 court denied Lee's petition, first stating: (1) Lee's claims failed to meet the specificity and factual pleading requirements of Rule 32.6(b) of the Alabama Rules of Criminal Procedure;[9] and (2) Lee's amended Rule 32 petition failed to state specifically what beneficial information a neuropsychiatric expert or investigator would have provided or found.

The Rule 32 court further found that Lee's allegations of ineffective assistance of counsel failed to show prejudice. The Rule 32 court stated that

---

[9]Rule 32.6(b) of the Alabama Rules of Criminal Procedure provides that a Rule 32 petition "must contain a clear and specific statement of the grounds upon which relief is sought, including full disclosure of the factual basis of those grounds." Ala. R. Crim. P. 32.6(b). "A bare allegation that a constitutional right has been violated and mere conclusions of law shall not be sufficient to warrant any further proceedings." Id. As discussed more later in our analysis on Lee's Batson claim, an Alabama state court's rejection of a federal constitutional claim under Rule 32.6(b) constitutes a ruling on the merits for purposes of AEDPA deference. See, e.g., Boyd v. Comm'r, Ala. Dep't of Corr., 697 F.3d 1320, 1331 (11th Cir. 2012) (collecting cases).

"[a]fter carefully considering the supplement to Lee's amended petition, the Court is convinced that there is no reasonable probability that had the proffered information been presented during Lee's trial it might have caused more jurors to recommend that Lee be sentenced to life imprisonment without parole." Additionally, the Rule 32 court (which had sentenced Lee) stated that had this evidence been presented, "it would not have persuaded this Court that the aggravating circumstance did not outweigh the mitigating circumstances."

## C.    State Appellate Court's Rule 32 Decision (Lee II)

The state appellate court affirmed the denial of Lee's amended Rule 32 petition. Lee v. State, 44 So. 3d 1145 (Ala. Crim. App. 2009) ("Lee II").

As to Lee's ineffective-assistance claim, the state appellate court agreed with the Rule 32 court that "Lee pleaded mere conclusions without any factual basis" and thus his amended Rule 32 petition generally failed to satisfy the specificity and factual pleading requirements of the Alabama Rules of Criminal Procedure. Id. at 1153. "For instance, Lee asserted that counsel failed to present evidence of his background, but he did not specifically identify what that evidence consisted of or what witness or witnesses could have substantiated that evidence." Id. Thus, the Rule 32 court was entitled to dismiss Lee's amended Rule 32 petition and decline to grant an evidentiary hearing, because even if all Lee's factual assertions were assumed to be true, he was not entitled to relief. See id. at 1156.

34

Moreover, the Rule 32-state appellate court affirmed because Lee's allegations did not demonstrate the requisite prejudice, citing Wiggins v. Smith, 539 U.S. 510, 123 S. Ct. 2527 (2003).[10]  The state appellate court observed that evidence of Lee's mental health and substance abuse was actually presented to the jury.  Lee II, 44 So. 3d at 1160 & n.3.  For example, during the guilt phase, the jury heard from Dr. Ronan concerning Lee's mental health, Principal Smith concerning Lee's academic history, and Dr. Blanton concerning Lee's purported mild mental retardation, and this testimony was invoked again in the penalty phase.  Id. at 1160–61.

Further, in the penalty phase, Lee's trial counsel presented the testimony of four of Lee's family members, including Lee's father and mother, with the former testifying that: (1) Lee was helpful until he got involved with drugs in the ninth or tenth grade; (2) Lee had a drug problem and needed help; and (3) Lee voluntarily turned himself in for the crimes.  Id. at 1161.  All Lee's family members asked that Lee's life be spared.  Id.  The state appellate court pointed out that the mitigation presentation Lee's trial counsel did make was "so persuasive that the jury recommended by a vote of 7 to 5 that Lee be sentenced to life imprisonment

---

[10]In Wiggins, the Supreme Court held that a petitioner had established prejudice when trial counsel failed to discover and present "powerful" mitigating evidence of the petitioner's severe privation, homelessness, physical torment, and sexual molestation.  539 U.S. at 534–38, 123 S. Ct. at 2542–44.

35

without the possibility of parole." Id.

The state appellate court concluded that even if all of Lee's alleged new mitigation evidence had been presented, that new mitigation evidence "was neither strong nor compelling." Id. The state appellate court was "confident that it would have had no impact on the penalty phase proceedings." Id.

## D.    Lee's Federal § 2254 Petition

In 2010, Lee filed a 28 U.S.C. § 2254 federal habeas petition, which the district court denied. The district court granted a certificate of appealability on Lee's penalty phase ineffective-assistance, Ring, and Batson claims. Lee timely appealed.

### IV. STANDARD OF REVIEW

We review de novo the denial of a petition for a writ of habeas corpus. See Johnson v. Upton, 615 F.3d 1318, 1330 (11th Cir. 2010). Section 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214, provides that federal courts may not grant a writ of habeas corpus to a state court prisoner on any claim adjudicated on the merits in state court unless the state court's decision: (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States"; or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the

36

State court proceeding." 28 U.S.C. § 2254(d) (emphasis added); see Trepal v.

Sec'y, Fla. Dep't of Corr., 684 F.3d 1088, 1107 (11th Cir. 2012).

A state court decision is "contrary to" clearly established federal law if it

applies a rule that contradicts the governing law set forth by the United States

Supreme Court, or arrives at a result that differs from Supreme Court precedent

when faced with materially indistinguishable facts. Bell v. Cone, 535 U.S. 685,

694, 122 S. Ct. 1843, 1850 (2002).

A state court decision involves an "unreasonable application" of clearly

established federal law "if the state court correctly identifies the governing legal

principle" from the relevant Supreme Court decisions "but unreasonably applies it

to the facts of the particular case." Id.; Williams v. Taylor, 529 U.S. 362, 413, 120

S. Ct. 1495, 1523 (2000). "[A]n unreasonable application of federal law is

different from an incorrect application of federal law." Williams, 529 U.S. at 410,

120 S. Ct. at 1522.

Further, the phrase "clearly established Federal law" "refers to the

holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time

of the relevant state-court decision." Id. at 412, 120 S. Ct. at 1523; see Burns v.

Sec'y, Fla. Dep't of Corr., — F.3d —, —, No. 11-14148, 2013 WL 3369145, at *4

(11th Cir. July 8, 2013). Circuit precedent may not be used "to refine or sharpen a

general principle of Supreme Court jurisprudence into a specific legal rule that [the

37

Supreme] Court has not announced." Marshall v. Rodgers, 569 U.S. —, —, 133 S. Ct. 1446, 1450 (2013).

In short, AEDPA "imposes a highly deferential standard for evaluating state-court rulings and demands that state-court decisions be given the benefit of the doubt." Trepal, 684 F.3d at 1107 (quoting Hardy v. Cross, 565 U.S. —, —, 132 S. Ct. 490, 491 (2011)). To be entitled to federal habeas relief under § 2254, a petitioner must show that the state court's ruling was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Harrington v. Richter, 562 U.S. —, —, 131 S. Ct. 770, 786–87 (2011). "A state court's application of clearly established federal law or its determination of the facts is unreasonable only if no 'fairminded jurist' could agree with the state court's determination or conclusion." Holsey v. Warden, Ga. Diagnostic Prison, 694 F.3d 1230, 1257 (11th Cir. 2012) (quoting Harrington, 562 U.S. at —, 131 S. Ct. at 780).

## V. INEFFECTIVE-ASSISTANCE CLAIM

### A.    Strickland v. Washington Test

Lee's ineffective assistance of counsel claim is governed by the Supreme Court's two-pronged test announced in Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052 (1984). See Johnson, 615 F.3d at 1330. Under the Strickland test, Lee must show both that: (1) his attorney's performance was deficient; and (2) the

deficient performance prejudiced the defense.  466 U.S. at 687, 104 S. Ct. at 2064.

Because we must view Lee's ineffective-assistance claim—which is already

governed by the deferential Strickland test—through the lens of AEDPA

deference, the resulting standard of review is "doubly deferential."  Digsby v.

McNeil, 627 F.3d 823, 831 (11th Cir. 2010), cert. denied, 131 S. Ct. 2936 (2011);

see also Harrington, 562 U.S. at —, 131 S. Ct. at 788 ("The standards created by

Strickland and § 2254(d) are both 'highly deferential,' and when the two apply in

tandem, review is 'doubly' so." (citations omitted)).

     In this case, we need not reach the performance prong because we are so

readily convinced Lee has not shown the requisite prejudice.  Strickland, 466 U.S.

at 697, 104 S. Ct. at 2069 ("[A] court need not determine whether counsel's

performance was deficient before examining the prejudice suffered by the

defendant as a result of the alleged deficiencies."); Frazier v. Bouchard, 661 F.3d

519, 531–32 (11th Cir. 2011) (stating we "may decline to reach the performance

prong of the ineffective assistance test if convinced that the prejudice prong cannot

be satisfied" (internal quotation marks omitted)); Windom v. Sec'y, Dep't of Corr.,

578 F.3d 1227, 1248 (11th Cir. 2009) (per curiam); Hall v. Head, 310 F.3d 683,

699 (11th Cir. 2002).  Indeed, the Supreme Court has said that "[t]he object of an

ineffectiveness claim is not to grade counsel's performance" and consequently,

"[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of

39

sufficient prejudice, which we expect will often be so, that course should be followed." Strickland, 466 U.S. at 697, 104 S. Ct. at 2069. We find that is the case here.

## B.    Prejudice Prong

To establish prejudice under Strickland, Lee "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." 466 U.S. at 694, 104 S. Ct. at 2068. In assessing prejudice, "we consider the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding—and reweigh it against the evidence in aggravation." Porter v. McCollum, 558 U.S. 30, 41, 130 S. Ct. 447, 453–54 (2009) (per curiam) (internal quotation marks and brackets omitted); Wiggins v. Smith, 539 U.S. 510, 534, 123 S. Ct. 2527, 2542 (2003) (in determining prejudice from failure to present mitigating evidence, "we reweigh the evidence in aggravation against the totality of available mitigating evidence"). To satisfy the prejudice prong, the "likelihood of a different result must be substantial, not just conceivable." Harrington, 562 U.S. at —, 131 S. Ct. at 792.

As to prejudice, the state appellate court concluded that "the evidence that Lee states should have been presented in mitigation was neither strong nor

40

compelling.  We are confident that it would have had no impact on the penalty phase proceedings." Lee II, 44 So. 3d at 1161.  Lee has not carried his burden of showing the state appellate court's determination was "contrary to, or involved an unreasonable application of, clearly established Federal law."  28 U.S.C. § 2254(d)(1).

At the outset, much of the alleged "new" mitigation evidence in Lee's amended Rule 32 petition and supplement is simply too general and conclusory to say there is a reasonable probability that had this alleged evidence been presented, it would have changed the outcome of Lee's proceeding.  See Price v. Allen, 679 F.3d 1315, 1325–26 (11th Cir. 2012) (per curiam).  Although Lee alleges, for example, that his family members "reported that [Lee's] drug and alcohol use got increasingly worse over time," and that Lee's trial counsel "failed to fully interview [Lee's] family members" and "failed to interview [Lee's] friends" who had knowledge of his alcoholism and his family history of alcoholism, Lee provides no factual allegations or specifics as to what family members or friends would have testified to or what more they would have said in addition to the substance abuse evidence that was presented at trial.

Even assuming all the allegations of new mitigation evidence in Lee's supplement are true, including the allegations of childhood poverty, gasoline sniffing, and his head injury, Lee still has not shown these facts would have altered

41

the outcome of Lee's penalty-phase proceedings. As the Rule 32 court pointedly stated, "[m]any people have grown up in socio-economic conditions far worse than those described by Lee and have not committed a double homicide and an attempted murder during an attempted robbery."

A comparison of Lee's allegations of childhood poverty and his parents' fights to the types of "powerful" mitigating evidence that the Supreme Court has found sufficient to establish prejudice under Strickland is instructive as Lee's evidence pales in comparison.

For example, in Rompilla v. Beard, 545 U.S. 374, 125 S. Ct. 2456 (2005), defense counsel failed to present evidence that: (1) "Rompilla's parents were both severe alcoholics who drank constantly"; (2) "[h]is mother drank during her pregnancy with Rompilla"; (3) "[h]is father, who had a vicious temper, frequently beat Rompilla's mother, leaving her bruised and black-eyed, and bragged about his cheating on her"; (4) "[h]is parents fought violently, and on at least one occasion his mother stabbed his father"; (5) Rompilla "was abused by his father who beat him when he was young with his hands, fists, leather straps, belts and sticks"; (6) "[a]ll of the children lived in terror"; (7) "[h]is father locked Rompilla . . . in a small wire mesh dog pen that was filthy and excrement filled"; (8) Rompilla "had an isolated background, and was not allowed to visit other children or to speak to anyone on the phone"; and (9) "[t]hey had no indoor plumbing . . . , [Rompilla]

42

slept in the attic with no heat, and [was] not given clothes and attended school in rags." Id. at 391–92, 125 S. Ct. at 2468–69; see also Wiggins, 539 U.S. at 516–17, 123 S. Ct. at 2532–33 (Wiggins's mother left the children home alone for days, forcing them to beg for food and to eat paint chips and garbage; she beat the children and had sex with men while the children slept in the same bed; in one incident, she forced Wiggins to touch a hot stove burner, resulting in hospitalization; and Wiggins's foster father and siblings molested and raped him).

In stark contrast to Rompilla and Wiggins, Lee alleged childhood poverty but admitted that his "parents did the best they could" and his father had a steady job until he was no longer able to work due to a heart attack. At most Lee claimed he was disciplined by both his parents with a switch or a belt, and that once, Lee's father spanked him with a belt at school to show the school principal he was "keeping after the boys." Lee generally alleged that his mother endured abuse from his father but provided no specific examples of incidents. And yet, in his § 2254 petition, Lee alleged that he "was living with a family that in many respects was a loving one." Taking all of Lee's allegations as true, we cannot say that the state appellate court's determination—that Lee's allegations of childhood poverty and domestic violence were insufficient to change the outcome of Lee's case—was "contrary to" or "involved an unreasonable application of" Strickland.

Furthermore, the additional mitigation evidence of Lee's substance abuse

43

was largely cumulative of the substance abuse evidence that the jury did hear at trial. Dr. Blanton testified to Lee's significant drug abuse problems. In the penalty phase, Lee's family members testified that Lee abused drugs. Lee does not explain how new and additional facts of substance abuse, such as the fact that he sniffed gasoline at a young age, would have changed the outcome, considering the jury had already heard that he abused alcohol and marijuana from a relatively young age and began performing poorly in school and acting strangely possibly as a result. See, e.g., Rhode v. Hall, 582 F.3d 1273, 1287 (11th Cir. 2009) (per curiam) ("At best, the evidence would have been cumulative, providing more information about [the petitioner's] . . . early exposure to drugs and alcohol."); Robinson v. Moore, 300 F.3d 1320, 1347 (11th Cir. 2002) ("While the additional mitigation witnesses procured by Robinson's [state postconviction] counsel could have presented the resentencing jury and trial judge with more details, or different examples, of these aspects of Robinson's life, these aspects of his life were nonetheless known to the resentencing jury and trial judge."); see also, e.g., Wong v. Belmontes, 558 U.S. 15, 22, 130 S. Ct. 383, 387–88 (2009).

Lee also does not allege, much less explain, how his claimed head injury reportedly resulting from a collision in 1995 caused any actual mental impairment or how this evidence would have changed the balance of mitigating and aggravating factors. See Powell v. Allen, 602 F.3d 1263, 1274 (11th Cir. 2010)

44

(per curiam) (rejecting claim counsel was ineffective for failing to investigate and present evidence of Powell's numerous head traumas because Powell failed to present information pertaining to the significance of these injuries, any medical evidence to substantiate the injuries, and failed to explain how this would have changed the outcome of his penalty phase). Lee does not allege the existence of any testimony from a medical professional or the existence of any medical records addressing his alleged head injury or mental impairments. In fact, in the Rule 32 case or even here, Lee has never proffered any information that would lead to any evidence that Lee suffers from mental illness or a diminished mental capacity beyond what was brought out in Dr. Blanton's testimony concerning possible mild mental retardation.[11]

Without any allegations explaining how his so-called "new" mitigating evidence affected his actions at the time he committed the crimes, and given the horrific and heinous facts of his two premeditated and cold-blooded murders, we cannot say that it was unreasonable for the state appellate court to conclude that Lee had not shown the requisite prejudice.

---

[11]Lee does fault his trial counsel for failing to "present evidence of Dr. Pineda's diagnosis of [Lee] as having some type of psychosis and his prescribing to [Lee] of anti-psychotic medications." But as we have previously stated, psychosis is not necessarily evidence jurors would look favorably upon and treat as a mitigating factor. See Evans v. Sec'y, Dep't of Corr., 703 F.3d 1316, 1332–33 (11th Cir. 2013) (en banc). We conclude that the state appellate court did not unreasonably apply Strickland when it determined that Lee was not prejudiced by the failure of trial counsel to further investigate and present this evidence in the penalty phase.

45

We wholly reject Lee's attempts to analogize his case to Porter v. McCollum, 558 U.S. 30, 130 S. Ct. 447 (2009). The factual differences between the two cases on the prejudice prong are so significant that, if anything, Porter demonstrates how Lee's alleged "new" evidence does not establish prejudice. In Porter, unlike this case, there was evidence of extensive childhood physical abuse and brain damage. See id. at 33–34, 36, 130 S. Ct. at 449, 451 (noting that Porter's father routinely beat Porter's mother in Porter's presence, Porter himself was a "favorite target" of his father's abuse, once Porter's father shot at him with a gun, and expert testimony indicated Porter had brain damage).

In contrast, Lee's factual allegations in his amended Rule 32 petition and supplement, if true, pale in comparison. As shown above, Lee does not identify any significant history of domestic violence involving him, but instead states only in generalities that his parents would frequently verbally abuse and berate him and sometimes whip him. Further, despite his factual allegations that he may have suffered head trauma in a car accident, Lee has never alleged that a physician, mental health professional, or other expert has concluded that Lee actually sustained a head injury or is otherwise mentally impaired or impacted from the accident. Lee also does not have any significant positive new mitigating evidence like that of the petitioner's military service in Porter. See Pooler v. Sec'y, Fla. Dep't of Corr., 702 F.3d 1252, 1276–79 (11th Cir. 2012) (contrasting Pooler's

46

military record with Porter's exemplary military record and concluding that "Porter presented a far more mitigating evidentiary profile than this case does").

Moreover, in Porter, defense counsel only presented one witness and the "sum total" of mitigating evidence amounted to "inconsistent testimony about Porter's behavior when intoxicated and testimony that Porter had a good relationship with his son." Porter, 558 U.S. at 32, 130 S. Ct. at 449. Here, Lee's trial counsel invoked the guilt-phase testimony of Dr. Blanton concerning Lee's diminished mental capacity as well as the guilt-phase testimony of Lee's supervisor, who testified that Lee was a competent employee. Lee's trial counsel also presented the testimony of four of Lee's family members, who testified about Lee's substance abuse, his problems in school, his strange behavior, and that Lee was loved and his life should be spared. Lee fails to credit that his trial counsel's mitigation efforts resulted in a jury recommendation of life imprisonment.

Indeed, the fact that the jury recommended life imprisonment counsels against a determination that Lee was prejudiced under Strickland. See Parker v. Allen, 565 F.3d 1258, 1275 (11th Cir. 2009) ("A petitioner cannot show sentencing phase prejudice when the jury recommends a sentence of life instead of death." (citing Routly v. Singletary, 33 F.3d 1279, 1297 (11th Cir. 1994) (per curiam))). And the Rule 32 court, the same state court that tried and sentenced Lee, explicitly stated that had Lee's additional mitigation evidence been presented, the court

47

would not have imposed a sentence of life imprisonment instead of death.  Thus,

Lee cannot show that "there is a reasonable probability that the sentencing judge

would have arrived at a different conclusion after being presented with the

additional evidence and reweighing the aggravating and mitigating circumstances."

Id. at 1285; see also Ferguson v. Sec'y for Dep't of Corr., 580 F.3d 1183, 1198–99

(11th Cir. 2009) (noting that Strickland asks if a different result is "reasonably

probable," not if it is "possible" (emphasis omitted)); see also Brown v. United

States, — F.3d  —, —, No. 09-10142, 2013 WL 3455676, at *6 (11th Cir. July 10,

2013) (quoting same from Ferguson).

    In sum, even taking all the alleged new mitigating evidence as true, and

considering it with the mitigating and aggravating evidence at trial, we conclude

that Lee has not shown prejudice and the state appellate court's rejection of Lee's

ineffective-assistance claim was not contrary to or an unreasonable application of

Strickland.

## VI. JURY-OVERRIDE CLAIM

### A.    Lee's Ring Claim

    Lee's next argument is that the state trial court's death sentence, overriding

the jury's recommendation of life without parole, violated Ring v. Arizona, 536

U.S. 584, 132 S. Ct. 2428 (2002).  The Supreme Court in Ring concluded that

under the Sixth Amendment "[c]apital defendants, no less than noncapital

48

defendants, . . . are entitled to a jury determination of any fact on which the legislature conditions an increase in their maximum punishment." Id. at 589, 122 S. Ct. at 2432. Lee contends that his death sentence is unconstitutional under Ring because the state trial judge in his case, not the jury: (1) found the specific aggravating fact that authorized the death penalty; and (2) concluded that the aggravating fact outweighed the mitigating circumstances.

## B.    Direct Appeal Decision

The state appellate court rejected Lee's claim that the trial judge improperly overrode the jury's sentencing recommendation. Lee I, 898 So. 2d at 858. First, the state appellate court noted that "[t]hese arguments have previously been decided adversely to" Lee in Harris v. Alabama, 513 U.S. 504, 115 S. Ct. 1031 (1995), which upheld as constitutional Alabama's sentencing regime permitting the trial judge alone to impose a capital sentence. Lee I, 898 So. 2d at 857.

Second, the state appellate court observed that both it and the Alabama Supreme Court had already held in other cases that the Supreme Court's later decision in Ring did not invalidate Alabama's sentencing law. The state appellate court further observed the Alabama courts had recognized "the narrowness" of the Ring holding, stating: "[t]he Ring Court held that any aggravating circumstance that increased a sentence to death must be proved to a jury beyond a reasonable doubt; however, we noted that the Ring Court did not reach the question whether

49

judicial sentencing or judicial override was constitutional." Id. (internal quotation marks omitted).

Third, the state appellate court pointed out that the state trial judge had found that one aggravating circumstance existed—Lee committed the capital offenses while he was engaged in the commission of an attempted robbery. The state appellate court reasoned that "[b]ecause the jury convicted [Lee] of the capital offense of robbery-murder, that statutory aggravating circumstance was proven beyond a reasonable doubt." Id. at 858. Therefore, the state appellate court found that in Lee's case "the jury, and not the judge, determined the existence of the 'aggravating circumstance necessary for imposition of the death penalty.'" Id. Thus, the state appellate court concluded that the judge's death sentence did not violate Ring v. Arizona. Id.

## C.    Jury's Guilty Verdict Included Armed Robbery

We can easily dispose of Lee's claim in light of the narrowness of the Supreme Court's holding in Ring. As the state appellate court in Lee I concluded, the jury's guilty verdict on the capital offense of robbery-murder established the existence of an aggravating circumstance sufficient to support a death sentence. In Alabama, a statutory aggravating circumstance is that "[t]he capital offense was committed while the defendant was engaged or was an accomplice in the commission of, or an attempt to commit . . . robbery." Ala. Code § 13A-5-49(4).

50

In the guilt phase, the jury convicted Lee of the capital offense of "[m]urder by the defendant during a robbery in the first degree or an attempt thereof committed by the defendant." Ala. Code § 13A-5-40(a)(2). A jury's guilt-phase finding of conviction under § 13A-5-40(a)(2) necessarily includes a finding that the aggravating circumstance in § 13A-5-49(4) is present. Alabama statute requires interpreting the jury verdict in this manner. See Ala. Code § 13A-5-45(e) ("[A]ny aggravating circumstance which the verdict convicting the defendant establishes was proven beyond a reasonable doubt at trial shall be considered as proven beyond a reasonable doubt for purposes of the sentencing hearing."). Nothing in Ring—or any other Supreme Court decision—forbids the use of an aggravating circumstance implicit in a jury's verdict. Indeed, Ring itself specifically left open and did not decide the question of whether the aggravator used to impose a death sentence could be implicit in the jury's verdict. See Ring, 536 U.S. at 609 n.7, 122 S. Ct. at 2443 n.7 ("We do not reach the State's assertion that any error was harmless because a pecuniary gain finding was implicit in the jury's guilty verdict.").

Furthermore, Ring does not foreclose the ability of the trial judge to find the aggravating circumstances outweigh the mitigating circumstances. As the Ring Court also made clear, it was not deciding whether the Sixth Amendment: (1) required the jury to make findings as to mitigating circumstances; (2) required the

51

jury to make the ultimate determination as to whether to impose the death penalty; or (3) forbade the state court from reweighing aggravating and mitigating circumstances. Id. at 597 n.4, 122 S. Ct. at 2437 n.4.

The holding of Ring is narrow: the Sixth Amendment's guarantee of jury trials requires that the finding of an aggravating circumstance that is necessary to imposition of the death penalty must be found by a jury. That occurred in Lee's case by virtue of the jury's capital robbery-murder verdict. Ring goes no further, and Lee points to no Supreme Court precedent that has extended Ring's holding to forbid the aggravating circumstance being implicit in the jury's verdict or to require that the jury weigh the aggravating and mitigating circumstances.

Accordingly, we must conclude that the state appellate court's decision is not contrary to or an unreasonable application of Ring, and Lee is not entitled to habeas relief on this claim.

## VII. LEE'S BATSON CLAIM

We left Lee's Batson claim for last because it requires so much more record review and legal analysis. Specifically, we: (1) must examine Batson and its progeny; (2) review the state trial court record of voir dire, peremptory challenges, and state trial court rulings; (3) outline the state appellate court's decision on Lee's Batson claim; (4) discuss whether AEDPA's deference applies to plain-error decisions by state courts; (5) review Supreme Court and Circuit precedent holding

52

that AEDPA applies to state court opinions that are summary adjudications or that contain less than complete discussion of all claims, facts, or arguments; and (6) then analyze whether under AEDPA, 28 U.S.C. § 2254(d)(1), the state court's Batson decision in Lee's case is an unreasonable application of clearly established federal law.

## A.    Batson and Its Progeny

It is clearly established federal law that, under the Equal Protection Clause, a criminal defendant has a constitutional "right to be tried by a jury whose members are selected pursuant to nondiscriminatory criteria." Batson v. Kentucky, 476 U.S. 79, 85–86, 106 S. Ct. 1712, 1717 (1986). In Batson, the Supreme Court established a three-step test for evaluating racial discrimination claims in jury selection.

In the first step, the defendant must establish a prima facie case by producing evidence sufficient to support the inference that the prosecutor exercised peremptory challenges on the basis of race. Johnson v. California, 545 U.S. 162, 169–70, 125 S. Ct. 2410, 2416–17 (2005); Batson, 476 U.S. at 96, 106 S. Ct. at 1723. In determining whether the defendant has made a prima facie case, the court must consider, inter alia: (1) any pattern of strikes against jurors of one race; and (2) "the prosecutor's questions and statements during voir dire examination" and in exercising peremptory challenges. See Batson, 476 U.S. at 97, 106 S. Ct. at 1723;

53

see also United States v. Walker, 490 F.3d 1282, 1291 (11th Cir. 2007) ("[A] pattern of strikes against all venire members of one race or gender is considered significant" in establishing a prima facie case.).

"Once the defendant makes a prima facie showing," in the second step "the burden shifts to the State to come forward with a neutral explanation for challenging black jurors." Batson, 476 U.S. at 97, 106 S. Ct. at 1723. The State may not rebut the defendant's prima facie case by simply denying a discriminatory motive or "affirm[ing] [his] good faith in making individual selections." Id. at 98, 106 S. Ct. at 1723–24 (alterations in original) (internal quotation marks omitted). The State's proffered explanation need not be "persuasive, or even plausible . . . . the issue is the facial validity of the prosecutor's explanation." Purkett v. Elem, 514 U.S. 765, 767–78, 115 S. Ct. 1769, 1771 (1995) (internal quotation marks omitted).

The Supreme Court has rejected the contention "that the justification tendered at the second step be not just neutral but also at least minimally persuasive." Id. at 768, 115 S. Ct. at 1771. "It is not until the third step that the persuasiveness of the justification becomes relevant . . . ." Id.

In the third and final step, "[t]he trial court . . . will have the duty to determine if the defendant has established purposeful discrimination." Batson, 476 U.S. at 98, 106 S. Ct. at 1724. This is "a pure issue of fact, subject to review under

54

a deferential standard . . . . [and] 'peculiarly within a trial judge's province.'"

Hernandez v. New York, 500 U.S. 352, 364, 365, 111 S. Ct. 1859, 1869 (1991)

(plurality opinion). Further, "[i]n deciding whether the defendant has made the

requisite showing, the trial court should consider all relevant circumstances."

Batson, 476 U.S. at 96, 106 S. Ct. at 1723; see also id. at 93, 106 S. Ct. at 1721

("In deciding if the defendant has carried his burden of persuasion, a court must

undertake a sensitive inquiry into such circumstantial and direct evidence of intent

as may be available." (internal quotation marks omitted)). Those relevant

circumstances may include the strength of the defendant's prima facie case at step

one. See id. at 97, 106 S. Ct. at 1723 (observing that "a 'pattern' of strikes against

black jurors . . . might give rise to an inference of discrimination"); see also

Hernandez, 500 U.S. at 375, 111 S. Ct. at 1875 (O'Connor, J., concurring in the

judgment) ("Disproportionate effect may, of course, constitute evidence of

intentional discrimination. The trial court may, because of such effect, disbelieve

the prosecutor and find that the asserted justification is merely a pretext for

intentional race-based discrimination.").

"In the typical peremptory challenge inquiry, the decisive question will be

whether counsel's race-neutral explanation for a peremptory challenge should be

believed." Hernandez, 500 U.S. at 365, 111 S. Ct. at 1869 (plurality opinion).

"[E]valuation of the prosecutor's state of mind based on demeanor and credibility

55

lies peculiarly within a trial judge's province." Id. (internal quotation marks omitted).  An appellate court may not "overturn the state trial court's finding on the issue of discriminatory intent unless convinced that [the trial court's] determination was clearly erroneous." Id. at 369, 111 S. Ct. at 1871; see also Anderson v. Bessemer City, 470 U.S. 564, 574, 105 S. Ct. 1504, 1511 (1985) ("Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.").  The determination "on the ultimate question of discriminatory intent represents a finding of fact of the sort accorded great deference on appeal." Hernandez, 500 U.S. at 364, 111 S. Ct. at 1868; see also Snyder v. Louisiana, 552 U.S. 472, 477, 128 S. Ct. 1203, 1208 (2008).

Ultimately, the burden of persuasion to show purposeful discrimination "rests with, and never shifts from, the opponent of the strike." Purkett, 514 U.S. at 768, 115 S. Ct. at 1771.  "[A] defendant may rely on 'all relevant circumstances' to raise an inference of purposeful discrimination" in the third step. Miller-El v. Dretke, 545 U.S. 231, 240, 125 S. Ct. 2317, 2325 (2005).  As to "side-by-side comparisons," the Supreme Court has said that "[i]f a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at Batson's third step." Id. at 241, 125 S. Ct. at

56

2325.[12]

Importantly too, "under <u>Batson</u>, the striking of one black juror for a racial reason violates the Equal Protection Clause, even where other black jurors are seated, and even when valid reasons for the striking of some black jurors are shown." <u>United States v. David</u>, 803 F.2d 1567, 1571 (11th Cir. 1986); <u>see also</u> <u>Snyder</u>, 552 U.S. at 478, 128 S. Ct. at 1208 ("Because we find that the trial court committed clear error in overruling petitioner's <u>Batson</u> objection with respect to [one venire member], we have no need to consider petitioner's claim regarding [a second venire member].").

With this Supreme Court background, we turn to the jury-selection record.

## B.    Jury Selection in Lee's Trial

Initially, the state trial court granted deferrals for hardship and inconvenience. Then outside the venire's presence, Lee's trial counsel moved to require the prosecutor to turn over the criminal histories of all venire members.[13] The prosecutor replied that he would provide the criminal history of anyone he struck on that basis.

---

[12]We primarily look to Supreme Court holdings extant at the time of Lee's 2000 trial and 2001-2003 direct appeal. Although <u>Johnson</u>, <u>Miller-El</u>, and <u>Snyder</u> were decided after Lee's trial and direct appeal, we find their holdings consistent with principles already set forth by the Supreme Court in <u>Batson</u>, <u>Purkett</u>, and <u>Hernandez</u>, which were decided before Lee's trial and direct appeal. <u>See</u> <u>McGahee v. Ala. Dep't of Corr.</u>, 560 F.3d 1252, 1261 n.13 (11th Cir. 2009).

[13]Lee's counsel had made a pretrial request for this information too.

57

The trial court had each potential juror give his or her name, occupation, marital status, and if married, his or her spouse's name and occupation. The court asked the venire a series of general questions, after which the attorneys questioned the venire. Given the capital murder charges against Lee, the primary focus of voir dire was the venire members' views on the death penalty. That afternoon, the state trial court broke the venire into smaller panels, and the court, prosecution, and defense asked questions of each panel regarding the death penalty. The defense moved once again to receive copies of all venire members' criminal histories, and the prosecution gave them to the defense.

The parties then exercised strikes. After cause strikes, there were 53 venire members remaining, consisting of 32 black persons (60.4%) and 21 white persons (39.6%). After peremptory challenges, the final jury consisted of 9 black jurors (75%) and 3 white jurors (25%), with one black alternate and one white alternate. The defense used its 20 peremptory strikes on 18 white and 2 black venire members. The State used all of its 21 peremptory strikes on black venire members. The record indicates that each party's last strike still sat as an alternate.[14]

Before the jury was sworn, Lee's counsel made a Batson motion, stressing

---

[14]We recognize that it is arguably inconsistent to say that a party's stricken juror still sat as an alternate. But that is what the record shows occurred. And as noted later, the State's last strike—alternate juror Kevin Stevens—was ultimately seated on the jury at the end of the guilt phase.

58

the State's use of all of its peremptory strikes against black venire members.  Lee's counsel asserted that this district attorney's office had a "history of racial discrimination in making jury selection[s]" and "many cases overturned with Batson problems."

The trial court asked, "How long have they had that problem?  I don't ever remember [prosecutor Edgar] Greene having one."  Lee's counsel cited only one case, "Robert Thomas v. State," and stated that "given the fact that the State [h]as exercised all of their peremptory challenges striking all Blacks," the defense had made a prima facie case under Batson.  The trial court required the State to respond with reasons for its strikes.

Prosecutor Greene responded that "[f]irst of all, Judge, there's no history of racial discrimination in striking the jury either in the District Attorney's Office or in this Circuit."  Greene added that "[t]here's been very few cases, if any, overturned on that basis."  Next Greene said, "Secondly, such action has not been done in this case.  Most of the strikes the State has made in this case are based on the opposition of jurors to the death penalty, and we're trying a death penalty case."

Although the State did not make its own Batson motion, Greene did point out that "the defense, most of its strikes, were striking White jurors.  In fact, I think all but three or four were exercised to remove White jurors from the panel."

59

Prosecutor Greene then explained his specific race-neutral reasons for each

of the State's 21 peremptory strikes. We quote what Greene said to the trial court

because the state appellate court quoted it too, and we review these reasons later

on. Prosecutor Greene gave his strike reasons for each venire member:

> [A]s to strike number 139, Demond Martin, [he] has a general opposition to the death penalty, and does have a bit of an arrest record.
>     The next strike was number 194, Alice Scott who has an arrest record of some note. Number 88 was the next strike, David Gutridge—no, Johnnie Hall, he opposed the death penalty. Didn't want to answer questions about it, does have an arrest record. Our number 17 [Angela Blythe] was strike number four.
> . . . .
>     Mrs. Blythe [was] opposed to the death penalty. Strike number five was number 56, Jerry Edwards. Opposed to the death penalty. Strike number six was juror number 100, Jessica Howard, opposed to the death penalty. Strike number seven was number 23, Mona Brown, opposed to the death penalty. Strike number eight was juror number five, Sherry Baker. Opposed to the death penalty. Strike number nine was Quintin Alexander, juror number one. He has knowledge of the defendant. Knew his family. Very uncomfortable about it. Strike number 10 was juror number 149, [Ora] Moore. Opposed to the death penalty. Didn't want to serve. Very uncooperative about the questions I asked. Strike number 11 was 126 Mary Kelley. Opposed to the death penalty. Strike number 12, number 171, Genett Pettway, opposed to the death penalty. Strike number 13 was 191, Vernell Saterfield. [She] was generally opposed to the death penalty. Has been involved in an incident where her spouse was charged with a drug offense and been found not guilty, and she was involved in some type of altercation with somebody. Strike number 14 was 155, Josephine Murry. Opposed to the death penalty. Strike number 15, was number 123, Towanda Jones. Opposed to the death penalty. Strike number 16 was 105, Ethel Hunter. Opposed to the death penalty. Strike number 17 was 246, Johnny Wilmer. Opposed to the death penalty. Strike number 18 was 146, Mary Mitchell. Opposed to

60

the death penalty. Strike number 19 was number 86, David Gutridge. Family member involved and convicted of a property crime. Opposed to the death penalty. Very uncooperative about answers. He had to be struck. Number 20 was number 57, [Annie] Ellis. Opposed to the death penalty. Very cooperative [sic] about the answer. Our final strike was number 213, Kevin Stevens. Child support hearing this week. Wanted to be off for that. I only assume we're prosecuting same. Struck him for that reason.

In summary, the prosecutor's reasons were: (1) 13 venire members were struck because they opposed the death penalty; (2) five venire members were struck for being opposed to the death penalty and other reasons, including because the venire member had an arrest record, was uncooperative in answering questions, had a spouse charged with a drug offense, and/or was involved or had a family member involved in a property crime; (3) one venire member was struck because of a pending child-support prosecution, probably by the same prosecutor's office; (4) one venire member was struck due to an arrest record; and (5) one venire member was struck because he knew the defendant.

After prosecutor Greene's statement of reasons, the state trial court found, "It appears you have given factually race valid reasons for striking."

The trial court also pointed out the makeup of the impaneled jury, noting that only 30% of the selected jury was white. The record confirms that, after cause and before peremptory challenges, the jury venire was about 40% white and 60% black, and the selected jury with alternates was 30% white and 70% black.

61

Without counting the alternates, the 12 member jury was 25% white and 75% black.

After the trial court's comments, Lee's counsel did not contest, dispute, or otherwise object to any of the prosecutor's reasons for 20 of the 21 struck venire members. Instead, he challenged only the prosecutor's child-support prosecution reason for striking Kevin Stevens, venire member 213, as follows:

> Judge, for the record, and to preserve the record, we're going to object to the last strike, Kevin Stevens, No. 213. The District Attorney gave the reason being he's going to be in child support court. There's no indication that there's any problem with him being in child support with any animosity towards the District Attorney's Office or him going to court. The mere fact that he's appeared in court is no reason why he should be struck from the jury.

Even as to Stevens, Lee's counsel did not dispute the truth of the factual premise of prosecutor Greene's stated reason that Stevens was going to be in a child-support hearing prosecuted by Greene's office, but argued only that it was no valid reason to strike that venire member. In response, Greene explained that his office prosecuted child-support cases and "[u]nfortunately that tends to create some difficulty with defendants that come before the Court. They feel somehow we're prosecuting them for a crime."

The trial court then stated to the defense: "All right, I'm going to overrule your motion."

After closing arguments in the guilt phase and outside the jury's presence,

62

the trial court determined that one juror had not appeared for trial that day, Darrell

Minter, a black juror, and therefore, an alternate juror would be used.  The two

alternate jurors were the last strikes of the State (Kevin Stevens, who is black) and

the defense (Melinda Poe, who is white).  Without objection, the trial court seated

Stevens.  Consequently, even with the use of an alternate, Lee's jury was still 75%

black.  The trial court observed that "since Kevin Stevens was the only one defense

objected to on Batson [grounds], I guess that takes care of that too."

In his direct appeal, Lee raised several new Batson arguments that were not

made in the trial court.  We focus on the state appellate court's decision because it

is the last reasoned decision of the state courts on Lee's Batson claim.  See Greene

v. Upton, 644 F.3d 1145, 1155 (11th Cir. 2011); Sweet v. Sec'y, Dep't of Corr.,

467 F.3d 1311, 1317 (11th Cir. 2006).

## C.    Direct Appeal Decision

The state appellate court's analysis of Lee's Batson claim proceeded in the

following way.  The court correctly identified Batson as the applicable test, and

stated that "[a]fter the appellant makes a timely Batson motion and establishes a

prima facie showing of discrimination [step one], the burden shifts to the state to

provide a race-neutral reason for each strike of a minority veniremember [step

two]." Lee I, 898 So. 2d at 813.  Consistent with Batson's step three, the state

appellate court observed that it would "reverse the circuit court's ruling on the

63

Batson motion only if it is 'clearly erroneous.'" Id.

After reviewing these Batson principles, the state appellate court implicitly turned to Batson's first step and stated that Lee's trial counsel objected on Batson grounds "after the State used all of its peremptory strikes against black veniremembers." Id. at 812. The court recounted the manner in which Lee's Batson objection was raised and evaluated in the trial court. It noted that after the jury was struck, but before it was sworn, Lee's trial counsel had made a Batson motion, and the trial court had required the prosecutor to state his reasons for exercising the State's peremptory strikes. Id. The appellate court also noted that the prosecutor had first observed that most of the State's strikes were made based on potential jurors' opposition to the death penalty. Id. But then the prosecutor had provided specific reasons for each of the State's 21 peremptory strikes. Id. at 812–13.

Despite the fact that at trial Lee had specifically objected to only the race-neutral reason given for striking venire member 213, Kevin Stevens, the state appellate court still evaluated in great detail all of the prosecutor's strike reasons to determine whether each was race-neutral. The court even reproduced in full the prosecutor's statement of the race-neutral reasons, given venire member-by-venire member, for each of the State's 21 peremptory strikes. Id. at 812–13.

Consistent with step two of Batson, the state appellate court then assessed

64

whether the prosecutor's proffered reasons were race-neutral.  See id. at 813–15.

To begin with, it observed that opposition to or even reservation about the death

penalty is a "reasonable explanation" for the exercise of a peremptory strike.  Id. at

813.  Therefore, according to the state appellate court, the reason stated for striking

venire members 17 (Angela Blythe), 56 (Jerry Edwards), 100 (Jessica Howard), 23

(Mona Brown), 5 (Sherry Baker), 126 (Mary Kelley), 171 (Genett Pettway), 155

(Josephine Murry), 123 (Towanda Jones), 105 (Ethel Hunter), 246 (Johnny

Wilmer), 146 (Mary Mitchell), and 57 (Annie Ellis), which was their opposition to

the death penalty, was a valid race-neutral reason.  Id. at 813–14.  As noted earlier,

Lee's trial counsel did not dispute that these 13 venire members' voir dire answers

indicated that they were opposed to the death penalty.[15]  Further, it is not surprising

that the State focused particularly on the venire members' views of the death

penalty, because the overwhelming evidence of Lee's guilt meant the main fight

would be about the sentence.

The state appellate court then addressed Lee's challenge to the strike of

venire member 194, Alice Scott, on the basis of her arrest record.  The court agreed

that an arrest record is a valid race-neutral reason for exercising a peremptory

---

[15]In his direct appeal and before this Court, Lee does not dispute that the state trial court record showed that during voir dire these 13 black venire members answered at least one question by stating that they were opposed to the death penalty.  Rather, as discussed later, Lee before this Court primarily challenges the State's reasons for striking two other black venire members: David Gutridge and Demond Martin.

strike.  Id. at 814.

The court next turned to the strikes of venire members 139 (Demond Martin), 86 (David Gutridge), 88 (Johnnie Hall), 149 (Ora Moore), and 191 (Vernell Saterfield).  See id.  The prosecutor had stated that he struck: (1) Demond Martin because of his opposition to the death penalty and his arrest record; (2) Johnnie Hall because of his opposition to the death penalty, his unwillingness to answer questions about it, and his arrest record; (3) Ora Moore because she was opposed to the death penalty, she did not want to serve, and she was uncooperative in answering questions; (4) Vernell Saterfield because she generally opposed the death penalty, her husband had been charged with a crime and found not guilty, and she herself had been in an altercation; and (5) David Gutridge because he had a family member who was convicted of a property crime, he was opposed to the death penalty, and he was uncooperative in answering questions.  The court concluded that all those reasons were valid race-neutral reasons.  Id. at 813–14.

Turning to venire member 1, Quintin Alexander, the prosecutor had stated the reason for that strike was that Alexander knew Lee and his family and Alexander was uncomfortable about it.  The court agreed this was a valid race-neutral reason.  Id. at 814.

After confirming that each of the prosecutor's reasons for the State's peremptory strikes was race-neutral, the appellate court turned to other arguments

66

Lee raised for the first time on direct appeal: that those race-neutral reasons were actually pretexts for racial discrimination. Id. at 815. Proceeding to the Batson step three inquiry, the court addressed Lee's arguments concerning each venire member for whom Lee, on direct appeal, claimed the State's specific race-neutral reasons were pretextual. In his direct appeal, Lee's brief argued that all of the State's 21 peremptory strikes were pretextual. As examples of that pretext, Lee's brief primarily discussed the State's strikes of seven venire members: Kevin Stevens, Josephine Murry, Johnnie Hall, Ora Moore, David Gutridge, Alice Scott, and Demond Martin.

The court first considered Lee's pretext argument concerning Kevin Stevens, which was the only pretext argument actually made before the state trial court. Since Stevens was later put on the jury, the court found Lee's argument moot. Id. Because Lee had not raised his other pretext arguments before the trial court, the appellate court evaluated the rest of Lee's pretext challenges for plain error under Alabama Rule of Appellate Procedure 45A. Id. Although issues not raised in trial courts are usually waived, Alabama's Rule 45A requires the state appellate court in death penalty cases to review such issues for plain error.[16]

---

[16]Alabama Rule 45A provides:

In all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate

67

The state appellate court then evaluated the plausibility of each of the prosecutor's contested reasons in light of the trial record. Lee I, 898 So. 2d at 815–17. The court concluded that the record did not support Lee's contentions that the prosecutor's strike reasons were false and did not demonstrate disparate treatment between black and white venire members. See id.

First, the court considered Lee's argument that the State did not strike white venire member Melinda Poe even though she was previously challenged for cause based on her opposition to the death penalty. The state trial court had denied the State's challenge of Poe for cause on this basis, stating, "I didn't have that" she could not impose the death penalty. Id. at 815. Lee contrasted Poe with the State's strikes against black venire members Josephine Murry and David Gutridge, who were struck by the State based on opposition to the death penalty despite the fact that their opposition was also disputed in the record. Id.

The appellate court noted the places in the voir dire transcript in which Murry wavered on the issue of whether she supported or opposed the death penalty. At various points, Murry said the death penalty was "a proper thing," she could "weigh the evidence and make a decision based on the evidence," but also stated she was "realizing [she] wasn't in favor of the death penalty because people

_____

appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant.

Ala. R. App. P. 45A (emphasis added).

68

were innocent" and "the reason [she] would say not the death penalty is because if [Lee] was innocent and he [was] killed . . . it wouldn't do any good to kill him." Id. The court concluded that Murry was not similarly situated to white venire member Poe, and thus Poe could not serve as a comparator for purposes of Lee's pretext argument as to the strike of Murry. Id.

Considering the other alleged comparator to Poe, black venire member Gutridge, the court agreed that the prosecutor was mistaken in stating that Gutridge opposed the death penalty. Gutridge had indicated that he could listen to the evidence and consider life imprisonment. Id. But the court noted that the prosecutor could exercise a peremptory strike based on a mistake, so long as it was an honest and race-neutral mistake. Id. "The record does not indicate that the prosecutor's reason was not based on an honest belief," and moreover, the prosecutor had an additional reason for the strike: Gutridge had a family member convicted of a property crime. Id. at 816. Thus, the court concluded that Gutridge and Poe were also not similarly situated. Id. In sum, the court found no disparate treatment with respect to Poe, Murry, and Gutridge, and therefore no plain error.[17]

_____

[17]At the time of Lee's direct appeal, "[i]n considering what constitutes plain error in a capital case," Alabama appellate courts followed "the interpretation given that term by the federal courts." See Hardy v. State, 804 So. 2d 247, 276 (Ala. Crim. App. 1999) (internal quotation marks omitted); Bush v. State, 695 So. 2d 70, 87 (Ala. Crim. App. 1995); see also Davis v. State, 740 So. 2d 1115, 1118 (Ala. Crim. App. 1998) ("The Alabama Supreme Court has adopted federal case law defining plain error . . . ." (internal quotation marks omitted) (citing

Id.

Next, the court addressed Lee's argument that the prosecutor's reason for striking several black venire members (Scott, Hall, and Martin) due to their arrest records was not supported by the record. Id. The court rejected this argument, observing that the prosecutor had documentation regarding the venire members' criminal histories and, before the parties made challenges for cause, the State provided the defense with "a copy of the criminal history on the venire." Id. The court also pointed out that the state trial court had assured defense counsel that it would allow the defense time to review the records before striking the jury. Therefore, the court concluded, Lee's argument that this arrest reason was pretextual was not supported by the record, and the court found no plain error. Id.

The court next addressed the prosecutor's strikes against Johnnie Hall, Ora Moore, and David Gutridge based on demeanor. The court noted that: (1) demeanor and reluctance to answer questions were race-neutral reasons for exercising strikes; (2) Lee did not dispute the prosecutor's assertions regarding

---

Ex Parte Womack, 435 So. 2d 766, 769 (Ala. 1983)). Under Alabama law, these four factors identified in United States v. Olano, 507 U.S. 725, 113 S. Ct. 1770 (1993), are the test for plain error: (1) whether there is error; (2) whether the error is plain; (3) whether the error affects substantial rights; and (4) if the first three factors are present, whether, in the court's discretion, correcting the error is appropriate because the error seriously affects "the fairness, integrity or public reputation of judicial proceedings." See Thomas v. State, 824 So. 2d 1, 12–13 (Ala. Crim. App. 1999) (internal quotation marks omitted), overruled on other grounds by Ex parte Carter, 889 So. 2d 528, 533 (Ala. 2004).

these venire members' demeanor at trial; and (3) the prosecutor offered additional, race-neutral reasons for each of these strikes. Id. The court could not "find that there was any plain error in this regard." Id.

The court next addressed Lee's argument that the State engaged in disparate treatment of black and white venire members with similar feelings regarding the death penalty when the State did not strike Melissa Speigner, a white venire member, but struck Murry, a black venire member. Id.

The state appellate court noted that during voir dire, Speigner initially indicated she opposed the death penalty, but later said that she would be able to listen to the evidence and recommend either death or life imprisonment based on the evidence. Id. As noted above, Murry similarly wavered on the appropriateness of the death penalty, but later added that she had subsequently realized she was not in favor of the death penalty and that "it wouldn't do any good to kill [Lee]." Id. The court concluded that Speigner and Murry were not similarly situated. Id. at 816–17. Speigner ultimately said that she would consider the death penalty and would vote based on the evidence presented. In contrast, Murry ultimately stated that although she could weigh the evidence and make a decision based on that evidence, she probably would not impose the death penalty. Id. at 817. Thus, because the two venire members were not similarly situated, the court concluded that Lee had shown no plain error in the State's strike of Murry and its retention of

71

Speigner.  Id.

Next, the state appellate court reviewed Lee's argument that the State had discriminated in its treatment of black venire members who had been accused of or charged with a property crime or who had family members or friends who had. Specifically, Lee asserted that the State did not strike white venire member Edwin Ember, who had indicated that he or a family member had been accused of or charged with a property crime, but it struck black venire member Gutridge who indicated the same.  Id.  The court observed that Lee's trial counsel used his own 12th peremptory strike against Ember, and the State used its 19th peremptory strike against Gutridge.  "Because the defense had long since struck veniremember [Ember] when the State struck veniremember [Gutridge], we do not find that there was any plain error in this regard."  Id.

Having reviewed the state appellate court's Batson decision, we turn to AEDPA's highly deferential standard for evaluating that state court ruling.

## VIII. AEDPA DEFERENCE TO PLAIN-ERROR REVIEW

Section 2254(d)(1) of AEDPA provides that a federal court may not grant habeas relief to a state prisoner on a Batson claim "adjudicated on the merits" in state court unless the state court's "decision [is] contrary to, or involved an unreasonable application of, clearly established Federal law."  28 U.S.C. § 2254(d)(1).  Before this Court Lee does not make a "contrary to" claim but

72

argues that the state appellate court's decision was "an unreasonable application of . . . clearly established Federal law" to the factual record in his case.  Id.  A threshold feature of the state court's decision—plain-error review—requires discussion before we get to our "unreasonable application" analysis of that court's decision.

Although Lee did not raise all of his Batson arguments in the trial court, the state appellate court did not apply a state procedural bar or deem those arguments waived.  Rather, except for juror Kevin Stevens, the state appellate court reviewed the merits of Lee's federal Batson claim, albeit for plain error under Alabama appellate rules.  See Lee I, 898 So. 2d at 809 (citing Ala. R. App. P. 45A).[18]

Consequently, the initial issue we must address is whether a state court's plain-error ruling is an adjudication "on the merits" that may be afforded AEDPA deference.  28 U.S.C. § 2254(d).  This Court has not squarely decided this question, although past decisions have suggested AEDPA deference may apply to plain-error rulings.  See Boyd v. Comm'r, Ala. Dep't of Corr., 697 F.3d 1320, 1331 (11th Cir. 2012); Frazier v. Bouchard, 661 F.3d 519, 524–27 (11th Cir. 2011); Borden v. Allen, 646 F.3d 785, 812 (11th Cir. 2011); Powell v. Allen, 602

---

[18]In Lee's direct appeal, the State argued for plain-error review, which the state appellate court then conducted not only of Lee's Batson claim, but also of other new issues Lee had raised for the first time on direct appeal.  See Lee I, 898 So. 2d at 809.  Before this Court, Lee does not contend that under Alabama law the state appellate court applied the wrong standard of review.

73

F.3d 1263, 1272–73 (11th Cir. 2010); Peoples v. Campbell, 377 F.3d 1208, 1223–24, 1235–37 (11th Cir. 2004). We now confront this issue and decide that AEDPA deference may apply to a state court's plain-error ruling.

To begin with, we have held repeatedly that a state court's rejection of a claim under the state's heightened-fact pleading rule in Alabama Rule of Criminal Procedure 32.6(b)[19] is a ruling on the merits. See Boyd, 697 F.3d at 1331; Frazier, 661 F.3d at 525; Borden, 646 F.3d at 812; Powell, 602 F.3d at 1272–73.

For example, in Frazier v. Bouchard, the § 2254 petitioner asserted an ineffective assistance of counsel claim. 661 F.3d at 522. Frazier had raised the ineffective-assistance claim in his state habeas petition and the state appellate court had dismissed that claim because Frazier had not complied with the state's heightened fact-pleading rule in Rule 32.6(b). Id. After the district court concluded that Frazier's federal ineffective-assistance claim was not reviewable because Frazier had procedurally defaulted the claim in state court, this Court reversed. Id. at 524–27. We noted that "though [the state appellate court's decision] invokes state pleading rules, [it] . . . plainly states that the claim is nonmeritorious, as Frazier failed to state his claim with the specificity required by Alabama's fact-pleading post-conviction scheme." Id. at 526–27 (footnote

---

[19]See supra note 9.

74

omitted).  Accordingly, we held that "Frazier's ineffective-assistance claim . . . was adjudicated 'on the merits'" and it was "subject to review under the standards of AEDPA."  Id. at 527; see also Borden, 646 F.3d at 816 ("[A]n Alabama court's consideration of the sufficiency of the pleadings concerning a federal constitutional claim contained in a Rule 32 petition necessarily entails a determination on the merits of the underlying claim . . . .  We therefore must review the merits determination . . . under the deferential standards set forth in AEDPA . . . ."); Powell, 602 F.3d at 1273 ("We thus review the Rule 32 court's rejection of Powell's claim as a holding on the merits.").

While the state appellate courts in Frazier, Powell, and Borden denied the claims on pleading grounds, whereas the state appellate court in this case denied Lee's Batson claim on plain-error review, these cases are instructive.  They show that a state court's dismissal simply for failure to plead with enough specificity is an adjudication of lack of merit entitled to AEDPA deference.

We also considered an issue like this one in Peoples v. Campbell.  In that capital case, the § 2254 petitioner raised an ineffective assistance of counsel claim, which the district court denied based on a procedural default.  Peoples, 377 F.3d at 1231.  Before this Court, the petitioner argued that he had raised the claim in the state courts, id. at 1233, and contended it was not procedurally defaulted, id. at 1231.  We found "that the [state appellate court] most likely considered the

75

constitutionality of [counsel's] performance as part of its perceived duty, under Rule 45A of the Alabama Rules of Appellate Procedure, to examine 'the record' for plain error." Id. at 1233. And we said: "Thus, in examining 'the record' of such 'proceedings' for plain error, the court felt duty bound to determine whether [counsel] had denied [the petitioner] his constitutional right to effective assistance of counsel." Id. We pointed out that the state appellate court had said: "We have . . . carefully considered [the petitioner's] assertions with reference to his representation by counsel," and "[w]e are clear to the conclusion that [the petitioner] failed to make out a case of either inadequate or ineffective representation by counsel at trial or on original appeal." Id. (emphasis omitted) (internal quotation marks omitted).

This Court concluded that because the state appellate court had reached the merits of Peoples's ineffective-assistance claim, the claim was not procedurally barred on federal habeas review. Accordingly, applying AEDPA, we reached the same conclusion as the state appellate court—that the ineffective-assistance claim failed on the merits. Id. at 1223–24, 1235–37.

As in Peoples, here the state appellate court reviewed Lee's Batson claim for plain error, under Rule 45A. Although neither Frazier nor Peoples explicitly addressed the issue of whether AEDPA deference applies to a state court's plain-error analysis, two other circuits have. Both circuits have concluded that when a

76

state appellate court applies a plain-error rule in deciding a federal claim, that

decision is an adjudication "on the merits" for purposes of § 2254(d)(1) and

AEDPA deference.  See Douglas v. Workman, 560 F.3d 1156, 1171, 1177–79

(10th Cir. 2009) (holding "when a state court applies plain error review in

disposing of a federal claim, the decision is on the merits to the extent that the state

court finds the claim lacks merit under federal law"); Fleming v. Metrish, 556 F.3d

520, 530–32 (6th Cir. 2009) (holding that, after state appellate court reviewed for

plain error, there was "little question that [the] claim was 'adjudicated on the

merits' for AEDPA purposes").[20]

In Douglas, the § 2254 petitioner argued that prosecutorial misconduct had

occurred during his state trial in violation of his federal due process rights.

Douglas, 560 F.3d at 1176–77.  When Douglas raised this claim on direct appeal,

the state appellate court "summarily dismissed [it] under the [state appellate

---

[20]The Eighth Circuit has also applied AEDPA deference to a state appellate court's plain-error analysis but without an explicit holding on the issue.  See Barnett v. Roper, 541 F.3d 804, 813–14 (8th Cir. 2008) (applying AEDPA deference to state appellate court's plain-error review of § 2254 petitioner's prosecutorial misconduct claim); Sublett v. Dormire, 217 F.3d 598, 600–01 (8th Cir. 2000) (after state appellate court reviewed prosecutorial misconduct claim for plain error, holding that "[u]nder the strict standard of review required by the AEDPA, Sublett is not entitled to habeas corpus relief"); James v. Bowersox, 187 F.3d 866, 869 (8th Cir. 1999) (applying AEDPA deference to a state appellate court's denial of a prosecutorial misconduct claim after the state appellate court reviewed the claim for plain error and labeled it "'without merit'"); see also Shelton v. Purkett, 563 F.3d 404, 408 (8th Cir. 2009) (assuming without deciding that a claim reviewed by the state appellate court for plain error was reviewable and not barred by a procedural default, "AEDPA mandates a deferential review of a state court decision").

court's] plain error doctrine," and the Tenth Circuit determined that AEDPA deference applied to that disposition. Id. at 1177–78. The Tenth Circuit explained that "'[a] state court may deny relief for a federal claim on plain-error review because it finds the claim lacks merit under federal law.'" Id. (quoting Cargle v. Mullin, 317 F.3d 1196, 1206 (10th Cir. 2003)). In a case like that, "'the state court's disposition would be entitled to § 2254(d) deference because it was a form of merits review.'" Id. at 1178 (quoting Cargle, 317 F.3d at 1206).

In Douglas, the state appellate court stated only that it had "reviewed" the federal claims and "found no plain error." Id. The Tenth Circuit explained that it was still required to "assume that the [state court's] review [was] on the merits and thus afford it § 2254(d) deference." Id.; see also Matthews v. Workman, 577 F.3d 1175, 1186 & n.4 (10th Cir. 2009) (after the state appellate court applied plain-error review to deny the § 2254 petitioner's federal claims, the Tenth Circuit "assess[ed] this decision through AEDPA's forgiving lens").

In Lee's case we do not have to decide whether to assume that all plain-error review entails a decision on the merits because we know that the Alabama appellate court reached the merits of Lee's Batson claim. The state court opinion here analyzed the merits of Lee's Batson claim and determined that there was no plain error. See Lee I, 898 So. 2d at 815–17. This is not a case where the state court assumed constitutional error that was plain and only looked to whether to

78

notice that plain error under the fourth prong of the plain-error review.[21]

The observations by the Sixth Circuit in Fleming are noteworthy.  In that case, the Sixth Circuit applied AEDPA's deferential review to the state appellate court's plain-error analysis of the § 2254 petitioner's Fifth Amendment claim. Fleming, 556 F.3d at 531–32.  This conclusion followed from the Sixth Circuit's observation that "the first step of the [state appellate court's] plain-error review essentially required addressing whether an error had occurred—an inquiry which, in this case, could not be accomplished without first adjudicating the merits of [the petitioner's] claim."  Id. at 532.  While plain-error review "made reversal of the state trial court's judgment less likely" it did not cause the state appellate court to "bypass the merits of [the petitioner's] claim and thereby avoid triggering AEDPA deference."  Id.

Like in Fleming, although the plain-error standard might have made it more difficult for Lee to succeed on direct appeal, the Alabama appellate court's use of that plain-error standard did not cause its opinion to be anything other than an adjudication "on the merits" entitled to AEDPA deference.  See Fleming, 556 F.3d at 532.

Accordingly, we hold that when a state appellate court applies plain-error

---

[21]See supra note 17.

79

review and in the course of doing so, reaches the merits of a federal claim and concludes there is no plain error, that decision is an adjudication "on the merits" for purposes of § 2254(d) and thus AEDPA deference applies to it.  As the Sixth Circuit pointed out in Fleming, it would contravene the comity and federalism principles that underlie AEDPA if we were to ignore the state appellate court's work and review Lee's Batson claim de novo.  Id. at 532.  We decline to do so. The Alabama appellate court's "substantive reasoning does not simply vanish" just because it applied plain-error review.  Id.  "Nor does AEDPA."  Id.[22]

## IX. AEDPA DEFERENCE TO SUMMARY OPINIONS

Because of Lee's arguments before this Court, a second feature of the state appellate court's decision warrants discussion.  Lee contends that this Court has recently established specific writing requirements for state court opinions before AEDPA deference will apply, citing McGahee v. Alabama Department of Corrections, 560 F.3d 1252 (11th Cir. 2009), and Adkins v. Warden, Holman CF, 710 F.3d 1241 (11th Cir. 2013).  More specifically, Lee argues that the state appellate court's decision in his case is an unreasonable application of Batson and is not entitled to any AEDPA deference because that opinion did not mention or discuss every relevant fact or argument he offered in support of his Batson claim

---

[22]We have no occasion to decide whether a plain-error review holding that turned exclusively on some non-merits consideration would be entitled to AEDPA deference.  That is not this case.

on direct appeal.  In this regard, Lee points out that the state appellate court's written opinion did not <u>explicitly</u> mention Lee's allegation of a jury-discrimination history in the district attorney's office and did not make an <u>explicit</u> credibility finding on <u>Batson</u>'s third prong.[23]  Lee, in essence, argues that a state court opinion must show it actually "consider[ed] every relevant circumstance" (and every argument) by explicitly mentioning each one.

We agree that the state court's opinion in Lee's case did not mention those two circumstances.  But we reject Lee's claim that a state court's written opinion involves an unreasonable application of federal law and is not entitled to deference unless that opinion on its face "shows its work" by explicitly mentioning "all relevant circumstances" argued by a defendant in a <u>Batson</u> appeal.  We explain why.  In doing so, we discuss Supreme Court precedent and then our Circuit precedent, both of which refute Lee's claim.

## A.    Supreme Court Precedent

For starters, the Supreme Court squarely held in <u>Harrington v. Richter</u> that a state court decision need not address every argument, nor even explain its reasoning, to be entitled to AEDPA deference as to its ruling on a federal

---

[23]We reject Lee's claim that the state appellate court also failed to mention that all the State's peremptory strikes were against black venire members.  The court acknowledged that "the State used <u>all of its peremptory strikes</u> against black veniremembers," and indeed quoted in full the reasons the prosecutor gave for each of the 21 strikes.  <u>Lee I</u>, 898 So. 2d at 812–13 (emphasis added).

constitutional claim.  562 U.S. at —, 131 S. Ct. at 784–85; see also Smith v. Sec'y, Dep't of Corr., 572 F.3d 1327, 1333 (11th Cir. 2009) ("In order to merit AEDPA deference the state court need not expressly identify the relevant Supreme Court precedent, nor make a perfect statement of the applicable rule of law, nor provide a detailed opinion covering each aspect of the petitioner's argument.").  Instead, "our focus on the 'unreasonable application' test under Section 2254(d) should be on the ultimate legal conclusion that the state court reached and not on whether the state court considered and discussed every angle of the evidence." Gill v. Mecusker, 633 F.3d 1272, 1290 (11th Cir. 2011) (quoting Neal v. Puckett, 286 F.3d 230, 246 (5th Cir. 2002) (en banc)).  The clear command in Harrington contradicts Lee's contention.

The Supreme Court's rationale behind Harrington is also instructive.  The Supreme Court first considered the AEDPA statute: "By its terms § 2254(d) bars relitigation of any claim 'adjudicated on the merits' in state court, subject only to the exceptions in §§ 2254(d)(1) and (d)(2)." Harrington, 562 U.S. at —, 131 S. Ct. at 784.  "There is no text in [§ 2254(d)] requiring a statement of reasons.  The statute refers only to a 'decision,' which resulted from an 'adjudication.'" Id.  The Supreme Court added that "[w]here a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." Id.  "This is so whether

82

or not the state court reveals which of the elements in a multipart claim it found insufficient, for § 2254(d) applies when a 'claim,' not a component of one, has been adjudicated." Id.

The § 2254 petitioner in Harrington argued that AEDPA deference should not apply to a state court's summary ruling because this would "encourage state courts to withhold explanations for their decisions." Id. The Supreme Court was unconvinced: "Opinion-writing practices in state courts are influenced by considerations other than avoiding scrutiny by collateral attack in federal court." Id. Further, "requiring a statement of reasons could undercut state practices designed to preserve the integrity of the case-law tradition." Id. Allowing summary dispositions "can enable a state judiciary to concentrate its resources on the cases where opinions are most needed." Id. In Harrington, the Supreme Court ultimately concluded that the state court's summary adjudication of a federal constitutional claim was not an unreasonable application of law under § 2254(d)(1). See id. at —, 131 S. Ct. at 788–92.

We reject Lee's attempt to limit Harrington to state court decisions with no reasoned opinion at all. Harrington's rule and rationale are not so confined. Rather, in Johnson v. Williams, 568 U.S. —, 133 S. Ct. 1088 (2013), the Supreme Court explained that a state court decision is an adjudication "on the merits" and still entitled to AEDPA deference when it "addresses some but not all of a

83

defendant's claims." Id. at —, 133 S. Ct. at 1094 (emphasis added).  The Supreme Court observed that there are good reasons why state courts do not address every single argument made by a defendant, including "instances in which a state court may simply regard a claim as too insubstantial to merit discussion." Id. at —, 133 S. Ct. at 1095.  "While it is preferable for an appellate court in a criminal case to list all of the arguments that the court recognizes as having been properly presented, federal courts have no authority to impose mandatory opinion-writing standards on state courts." Id. (citations omitted).  The Supreme Court cautioned federal habeas courts that "[t]he caseloads shouldered by many state appellate courts are very heavy, and the opinions issued by these courts must be read with that factor in mind." Id. at —, 133 S. Ct. at 1095–96 (footnote omitted).  It makes no sense to say that a state court decision is entitled to AEDPA deference if the opinion fails to contain discussion at all of a claim but is entitled to no deference if it contains some but less than complete discussion.

While under Batson a state court assuredly must evaluate the totality of the evidence and consider "all relevant circumstances," this is a far cry from a federal court requiring that a state court prove to a federal court that it did so by setting out every relevant fact or argument in its written opinion.  The test in § 2254(d)(1) is whether the state court "unreasonably appl[ied]" Batson and its progeny to the facts of Lee's case.  The test is not about how long the state court opinion is or

84

whether it explicates every relevant fact and argument.

The Supreme Court has emphasized that "readiness to attribute error" to a state court decision is incompatible with both "the presumption that state courts know and follow the law" and AEDPA's "highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt." Woodford v. Visciotti, 537 U.S. 19, 24, 123 S. Ct. 357, 360 (2002) (citation omitted) (internal quotation marks omitted). We have similarly stressed that "a 'grading papers' approach . . . is outmoded in the post-AEDPA era," such that we will not assume that a state court either misapplied or misunderstood clearly established federal law absent a "conspicuous misapplication of Supreme Court precedent." Parker v. Sec'y for Dep't of Corr., 331 F.3d 764, 785–86 (11th Cir. 2003) (internal quotation marks omitted). Accordingly, based on this Supreme Court precedent, we reject the stringent opinion-writing rules for state court opinions that Lee advocates here.

## B.    Our Circuit Precedent

The Supreme Court's Harrington and Johnson decisions are enough. But even before them, our own Circuit precedent required that we afford AEDPA deference even where the state court's decision is a summary adjudication or engages in only some evaluation because "implicit findings" may be inferred from dispositive rulings. See Greene v. Upton, 644 F.3d 1145, 1155–56 (11th Cir.

85

2011) (emphasizing in a § 2254 capital case that "Batson does not require elaborate factual findings" and applying AEDPA deference to a state court's Batson ruling even though it did not address every argument or make an explicit fact finding on Batson's third step); Blankenship v. Hall, 542 F.3d 1253, 1271–72 (11th Cir. 2008) (stating in a § 2254 capital case that "implicit findings" may be inferred from a state court opinion and record and "these implicit findings of fact are entitled to deference under § 2254(d) to the same extent as explicit findings of fact"); Hightower v. Terry, 459 F.3d 1067, 1072 n.9 (11th Cir. 2006) (deferring to a state court judgment on a Batson claim in a § 2254 capital case and noting a state court's "dispositive ruling may contain implicit findings, which, though unstated, are necessary to that ruling" (citing United States v. $242,484.00, 389 F.3d 1149, 1154 (11th Cir. 2004) (en banc) ("[W]e and other federal appellate courts have 'inferred from a district court's explicit factual findings and conclusion implied factual findings that are consistent with its judgment although unstated.'"))); Atwater v. Crosby, 451 F.3d 799, 807 (11th Cir. 2006) (applying AEDPA deference in a § 2254 capital case, where the state appellate court's opinion "improperly condensed the second and third steps of Batson" but the opinion contained "some evaluation of the prosecutor's reasons for the strike"); see also Johnson v. Sec'y, DOC, 643 F.3d 907, 910 (11th Cir. 2011) ("When faced with an ineffective assistance of counsel claim that was denied on the merits by the state

86

courts, a federal habeas court 'must determine what arguments or theories supported or, [if none were stated], could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court.'" (quoting Harrington, 562 U.S. at —, 131 S. Ct. at 786) (alterations in original)).[24]

We recognize, of course, that this Court in McGahee in 2009 and Adkins in 2013 held in § 2254 capital cases that a state court's decision denying Batson relief was an unreasonable application of Batson given the explicit racial statements and strong evidence of discriminatory purpose in each case. Contrary to Lee's arguments, however, we do not read those two decisions as establishing new rules for state court opinion-writing before state court decisions may be entitled to AEDPA deference. What drove the unreasonable application result in each of those two cases was the abundant racial discrimination evidence that demonstrated

---

[24]We contrast (a) a state court's not explicitly addressing a claim or argument made by a petitioner and our inferring findings from that state court's decision to (b) a wholly different type of case where the state court's opinion itself makes clear that it considered one claim but expressly decided not to reach or rule on another claim. If a state court opinion expressly tells us that it is not ruling on an issue, then there is no ruling to which we can defer. See, e.g., Johnson, 643 F.3d at 930 n.9 ("The Court's instruction from Harrington does not apply here because the Florida Supreme Court did provide an explanation of its decision which makes clear that it ruled on the deficiency prong [of the Strickland test] but it did not rule on the prejudice prong, and it is also clear that the trial court's ruling on the prejudice prong did not address counsel's investigation and presentation of non-statutory mitigating circumstances evidence. As a result, we are still required to follow the Court's instructions from [ineffective-assistance cases] Rompilla and Wiggins and conduct a de novo review." (citation omitted)).

87

that the state court's <u>Batson</u> decision was an unreasonable application of clearly established federal law. There is some loose language to be sure but no holding in either <u>McGahee</u> or <u>Adkins</u> that a state court <u>Batson</u> opinion must discuss every fact or argument to be a reasonable application of <u>Batson</u> under § 2254(d). Given the solid wall of prior panel precedent and Supreme Court decisions prohibiting such an approach, we do not read those two decisions as holding that AEDPA deference does not apply to state court decisions accompanied by opinions that do not discuss all the evidence, circumstances, or arguments.

If <u>McGahee</u> or <u>Adkins</u> were interpreted as holding that, they would run afoul of our earlier precedent in <u>Atwater</u>, <u>Hightower</u>, <u>Blankenship</u>, and <u>Greene</u>, and we must follow the earlier precedent of these decisions. See <u>United States v. Ohayon</u>, 483 F.3d 1281, 1289 (11th Cir. 2007) ("When a decision of this Court conflicts with an earlier decision that has not been overturned <u>en banc</u>, we are bound by the earlier decision."); <u>Burke-Fowler v. Orange Cnty., Fla.</u>, 447 F.3d 1319, 1323 n.2 (11th Cir. 2006) ("[W]hen a later panel decision contradicts an earlier one, the earlier panel decision controls."); <u>Tompkins v. Moore</u>, 193 F.3d 1327, 1331 (11th Cir. 1999) (stating that the Court was "duty bound to follow the decisions" in two earlier Circuit decisions instead of a more recent Circuit decision under the prior panel precedent rule).

Lest there be any doubt, we recount our precedent in detail and in order of

the earliest precedent first.

## C.    Atwater v. Crosby (2006)

In Atwater, a 2006 decision in a § 2254 capital case, this Court emphasized that a state court decision is still entitled to AEDPA deference where the state court engages in "some evaluation" but improperly condenses the second and third steps of Batson.  451 F.3d at 807.

At trial, Atwater objected to the State's peremptory strike of the sole black venire member, and the state trial court required the prosecutor to provide a race-neutral reason for the strike.  Id. at 804–05.  The prosecutor stated that he struck the venire member because of her demeanor and voir dire answers, which suggested she was hesitant about serving in a death penalty case.  Id. at 805. Atwater's counsel disagreed.  Id.  The trial court then said that, in "observing that particular juror, [it] thought that she did respond with difficulty to the questions that were asked."  Id.  The court found the "State's peremptory challenge will be well-taken."  Id.

In Atwater's direct appeal, the Florida Supreme Court affirmed, giving only this four-sentence Batson analysis:

> Upon Atwater's objection to the peremptory challenge, the trial court inquired as to the State's reasons.  The record reflects that the court's inquiry was adequate and the record supports the State's explanation for exercising the challenge.  The court expressly noted that the prospective juror had difficulty answering the questions put to her and

89

her demeanor indicated that she was hesitant and uncomfortable regarding the death penalty. This is a valid, race-neutral reason for exercising a peremptory challenge, and the court did not abuse its discretion in upholding the challenge.

Id. at 806–07 (quoting Atwater v. State, 626 So. 2d 1325, 1327 (Fla. 1993)).

Considering the analysis of the state appellate court quoted above, this Court concluded that the Florida Supreme Court had "improperly condensed the second and third steps of Batson." Id. at 807. "However, given the great deference afforded the determinations of state courts under § 2254," this Court said we could not "reach the conclusion that the trial court or the Florida Supreme Court unreasonably applied Batson in this case" under § 2254(d)(1). Id. This was because "the trial court went beyond a mere finding that the state articulated a race neutral reason for the strike—the trial court engaged in some evaluation of the prosecutor's reasons for the strike and determined that the race neutral reason given . . . was supportable." Id. (emphasis added). "Therefore, the third step of the Batson analysis was touched." Id.

## D.    **Hightower v. Terry** (2006)

Next, in Hightower, another 2006 decision in a § 2254 capital case, this Court went further and stated that a state court's denial of a Batson motion may contain implicit findings. Hightower v. Terry ("Hightower II"), 459 F.3d 1067, 1072 n.9 (11th Cir. 2006).

90

In his <u>Batson</u> objections, Hightower argued that he had established a prima facie case because: (1) the prosecution had exercised 6 of its 7 peremptory strikes against black venire members; and (2) the prosecutor had "in the past shown a bent and scheme" to remove black persons from juries. <u>Hightower v. Schofield</u> ("<u>Hightower I</u>"), 365 F.3d 1008, 1031 (11th Cir. 2004), <u>vacated by</u> 545 U.S. 1124, 125 S. Ct. 2929 (2005), <u>new opinion on remand</u>, 459 F.3d 1067 (11th Cir. 2006), <u>cert. denied</u>, 550 U.S. 952, 127 S. Ct. 2254 (2007). The prosecutor denied any attempt to discriminate, but the court required him to provide strike reasons, which he did. <u>Id.</u> at 1032. The court summarily ruled that Hightower "had failed to make a prima facie case of discrimination, and alternatively, that the prosecutor had 'presented an articulable, nonrace related reason for striking' each prospective black juror." <u>Id.</u>

On direct appeal, the Georgia Supreme Court affirmed and its <u>Batson</u> discussion was brief and never explicitly mentioned <u>Batson</u>'s third step. <u>Hightower v. State</u>, 386 S.E.2d 509, 512 (Ga. 1989).[25]

---

[25]The Georgia Supreme Court's entire discussion of Hightower's <u>Batson</u> claim is nine sentences:

> The defendant contends the prosecution was guilty of racial discrimination. <u>See</u> <u>Batson v. Kentucky</u>, 476 U.S. 79, 106 S. Ct. 1712, 90 L.E.2d 69 (1986). The prosecutor used only seven of his authorized 10 peremptory strikes. He used six of those seven strikes against black prospective jurors. The record shows that at least two black prospective jurors were struck by the defendant after having been accepted by the prosecutor. The prosecutor explained his peremptory challenges.

Hightower's § 2254 petition asserted that the state courts had misapplied Batson. This Court affirmed the denial of Hightower's Batson claim. Hightower I, 365 F.3d at 1035. We explained that, assuming Hightower had stated a prima facie case, "the prosecutor gave specific, nonracial reasons for each of his strikes of African-Americans," satisfying step two. Id. at 1034. As to the third step, the state courts made no explicit findings about the prosecutor's credibility or about discriminatory purpose, or anything at all relating to that step. Yet, this Court still deferred to "the state court judgment," stating: "[O]ur task is to determine, in consideration of 'all relevant circumstances,' and given our constraints under 28 U.S.C. § 2254, whether the state court judgment in this case runs afoul of federal law. We cannot say that it does." Hightower I, 365 F.3d at 1035 (citation omitted) (emphasis in original). Even though the state courts made no explicit fact findings, this Court deferred to the state courts' judgments and stressed "the trial court's

---

Four of the challenged prospective jurors were closely related to persons convicted of serious felonies. The other two were conscientiously opposed to the death penalty, although not to the extent they were excused for cause. The trial court found that the prosecutor had articulated legitimate non-racial reasons for his challenges. Even assuming the defendant made out a prima facie case, Cf. Childs v. State, 257 Ga. 243(21), 357 S.E.2d 48 (1987), the trial court's determination is not clearly erroneous. Compare Foster v. State, 258 Ga. 736(2), 374 S.E.2d 188 (1988).

Hightower v. State, 386 S.E.2d 509, 512 (Ga. 1989). In contrast, the state appellate court's evaluation of Lee's Batson claim spans five published pages. Lee I, 898 So. 2d at 812–17. In any event, there is no minimum number of sentences or pages required for a state court merits adjudication on a federal constitutional claim to be entitled to AEDPA deference. See Harrington, 562 U.S. at —, 131 S. Ct. at 785; see also Johnson, 568 U.S. at —, 133 S. Ct. at 1094.

92

superior position to observe the prosecutor's 'credibility' and 'demeanor.'" Id. at 1034.

Thereafter, the Supreme Court granted Hightower's petition for certiorari, vacated our first opinion in Hightower I, which had been issued in 2004, and remanded for further consideration in light of Miller-El v. Dretke, 545 U.S. 231, 125 S. Ct. 2317 (2005). Hightower v. Schofield, 545 U.S. 1124, 1124, 125 S. Ct. 2929, 2929–30 (2005).

On remand in Hightower II, this Court concluded that "Miller-El does not counsel a decision contrary to the one we reached in Hightower [I], and therefore [we] adhere to that decision." Hightower II, 459 F.3d at 1069 (2006). We distinguished Miller-El on the basis that, unlike the case in Miller-El, "we did not decide Hightower's Batson claim on the basis of an augmented record." Id. at 1070. "[R]ather, we were, and are post-Miller-El, limited to the evidentiary record developed in the state trial court during jury selection and the trial court's ruling, Hightower's and the State's briefs to the Supreme Court of Georgia . . . , and that court's opinion." Id. This Court restated its conclusion in Hightower I as still applicable in Hightower II: "Hightower never provided the [state trial] court with any evidence tending to discredit the persuasiveness of the prosecutor's stated reasons for striking black jurors." Id. at 1071 (alteration in original) (quoting Hightower I, 365 F.3d at 1035) (internal quotation marks omitted).

93

This Court in Hightower II (on remand) expressly addressed whether the state courts had erred on Batson's third step by not entering an explicit finding that the prosecutor's race-neutral reasons were credible.  Id. at 1072 n.9.  We pointed out "that a trial court's dispositive ruling may contain implicit findings, which, though unstated, are necessary to that ruling."  Id.[26]

Applying that "implicit findings" principle, the Hightower II Court noted that "the trial court, after assuming that Hightower had made out a prima facie case of racial discrimination, expressly found that the prosecutor had provided an 'articulable, nonrace related reason' for each strike, and overruled Hightower's Batson objection."  Id.  Thus, we made "'the common sense judgment'—in light of defense counsel's failure to rebut the prosecutor's explanations and the trial court's ultimate ruling—that the trial court implicitly found the prosecutor's race-neutral explanations to be credible, thereby completing step three of the Batson inquiry," even though the trial court did not explicitly complete it.  Id.

### E.    Blankenship v. Hall (2008)

In Blankenship, another § 2254 capital murder case, this time involving an ineffective assistance of counsel claim, this Court reiterated Hightower II's

---

[26]In Hightower II, we also observed that this Court had applied this principle in two earlier Batson-issue federal cases, in which we upheld a district court's overruling of a Batson objection even though the district court did not explicitly find the prosecutor's race-neutral explanations to be credible.  459 F.3d at 1072 n.9 (citing United States v. Cure, 996 F.2d 1136, 1138–39 (11th Cir. 1993); United States v. David, 844 F.2d 767, 769 (11th Cir. 1988)).

admonition that a state court's dispositive rulings contain "implicit findings" which are entitled to AEDPA deference. 542 F.3d at 1271–72. The state habeas court "rejected Blankenship's ineffective assistance claim in a summary fashion." Id. at 1270. Blankenship argued to this Court that the state court's summary decision was not entitled to AEDPA deference. Id. at 1271.

The inquiry for the Blankenship Court was "whether the state court 'adjudicated on the merits' the ineffective-assistance claim when it summarily rejected Blankenship's arguments" in its order. Id. This Court stated that "our case law is clear: We have repeatedly held 'a state court's summary rejection of a claim qualifies as an adjudication on the merits under § 2254(d) so as to warrant deference.'" Id. (collecting cases).

Following Hightower II's precedent, this Court in Blankenship reiterated that "a state court's 'dispositive ruling may contain implicit findings, which, though unstated, are necessary to that ruling.'" Id. at 1272 (quoting Hightower II, 459 F.3d at 1072 n.9). Those implicit findings may be "inferred from [the state court's] opinion and the record," and those "implicit findings of fact are entitled to deference under § 2254(d) to the same extent as explicit findings of fact." Id. Thus, the Court could "make the common sense judgment that material factual issues were resolved by the trial court in favor of the judgment when it was reasonable for that court to have done so in light of the evidence." Id. (quoting

95

Hightower II, 459 F.3d at 1072 n.9) (internal quotation marks omitted).  "In other words," the Blankenship Court said, "we may uphold the state court's decision that counsel was not constitutionally deficient if our review of the record reveals that a reasonable view of the facts before the state court supports such a conclusion."  Id. Ultimately this Court concluded that the state court did not unreasonably apply Strickland under § 2254(d)(1) and the state court decision was entitled to deference.  Id. at 1281.

Thus, even before the Supreme Court's decisions in Harrington and Johnson, this Court in § 2254 capital cases had already held that a state court's summary disposition of a federal constitutional claim, as well as a state court Batson decision that contained a less than complete discussion and evaluation of the prosecutor's reasons for peremptory strikes, were entitled to AEDPA deference. And this Court had already held that any fact findings necessary to a state court's Batson decision, which have support in the record, can and should be inferred from the judgment; they need not be stated in the opinion of the state court.

## F.    McGahee v. Alabama Department of Corrections (2009)

Next came McGahee, where an all-white jury had been empanelled because the prosecutor struck all black persons from the jury venire in 1986.  McGahee, 560 F.3d at 1258–59; see also id. at 1266 (noting that "[a]t the time McGahee was tried, Dallas County, Alabama was fifty-five percent African-American" but his

96

jury was all white).

The McGahee Court held that the state appellate court "unreasonabl[y] appli[ed]" Batson when it failed "to consider the State's articulation of an explicitly racial reason for striking [venire member Lemuel] Jones." Id. at 1264. That state court's decision "also failed to consider two additional crucial facts," shown in the trial record and raised by McGahee's direct appeal brief: (1) the fact that all black persons were removed from the venire by the State; and (2) the State had offered as a reason for striking multiple black venire members "low intelligence," even though the intelligence of the venire members was unsupported by any evidence in the record and that reason was "historically tied to racism." Id. at 1265. We concluded that the state appellate court's failure to consider these two critical facts was an unreasonable application of Batson to the record in McGahee's case. Id. at 1265–66. To better understand the failure to consider rationale and why we held there was an unreasonable application of Batson, we review the facts in McGahee.

After McGahee lodged his Batson objection in the state trial court, the State gave only general explanations for striking all black venire members, except for Dr. Willis Wright. Id. at 1258. The State said it struck Dr. Wright because he had asked to be excused and the State was concerned he "would . . . not be a very happy juror." Id. The state trial court denied the defendant's Batson motion. Id.

97

Only after the jury's verdict did the State give "individualized, specific reasons for its peremptory strikes," including the strike against a venire member named Lemuel Jones, but the state trial court never ruled on any of them.  Id. at 1259–60.

After reviewing the state court record, this Court in McGahee determined that the State had given an "explicitly racial reason for striking Jones," which the state appellate court had ignored.  Id. at 1264 (emphasis added).  In McGahee the state appellate court's opinion had on its face expressly addressed two stated reasons for striking Jones.  It agreed that the State's first reason for striking Jones—he was a teacher—was "totally insufficient," and that while its second reason—the State lacked information on Jones—was "somewhat weak," it was a "sufficient" reason.[27]  Id.  The state appellate court did not expressly discuss the State's third reason: that Jones was struck because with Dr. Wright leaving the venire, the State did not want to leave Jones "individually."  Id.

In McGahee this Court found that this third reason could only mean that the State did not wish to leave Jones "individually" as the sole black venire member.  Id.  We emphasized that at oral argument in McGahee, the State was pressed for a non-racial interpretation of this statement about Jones but could not provide one.  Id.  We found that in this third reason the State had articulated "an explicitly racial

---

[27]In McGahee's direct appeal, the Alabama appellate court noted that the State's lack of information reason was "sufficient because the State struck a white [venire member] for the same reason."  McGahee v. State, 554 So. 2d 454, 462 (Ala. Crim. App. 1989).

98

reason for striking Jones." Id.

Critically, the McGahee Court said: "As we understand the Alabama court's analysis, it read the record as providing two reasons for the strike of Lemuel Jones . . . . The court clearly limited its review to only these two reasons and did not implicitly review any other reasons." Id. (emphasis added). In McGahee, this Court acknowledged that state court opinions can "implicitly" review strike reasons and evidence, but we read the Alabama court as saying in its opinion that it had "clearly limited" its own appellate review to the two non-racial reasons for the Jones strike, and thus showing it had not considered the State's explicitly racial reason. See id. The state court's unreasonable application of Batson was not the failure to mention, but the failure to even implicitly consider the explicitly racial reason given for striking Jones—thereby ruling out any consideration of that racial reason.[28]

_____

[28]In McGahee, 560 F.3d at 1262, this Court quoted Williams v. Taylor, 529 U.S. 362, 120 S. Ct. 1495 (2000), where the majority observed that the state court's opinion discussed some evidence, "[b]ut the state court failed even to mention the sole argument in mitigation that trial counsel did advance." Id. at 398, 120 S. Ct. at 1515. This observation related to the prejudice prong of an ineffective-assistance claim, where a court must "evaluate the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding—in reweighing it against the evidence in aggravation." Id. at 397–98, 120 S. Ct. at 1515. But the failure to mention this argument was not how the state court unreasonably applied Strickland. The Supreme Court ultimately held that the state supreme court had unreasonably applied Strickland because the state court had both: (1) mischaracterized the Strickland prejudice test, id. at 397, 120 S. Ct. at 1515; and (2) failed to entertain the possibility that mitigating evidence unrelated to dangerousness may alter the jury's selection of penalty, and thereby failed

99

Having concluded that the state appellate court unreasonably applied Batson to the facts of McGahee's case, we reviewed McGahee's Batson claim de novo. In that de novo review, this Court found that the McGahee record "compel[led] a finding that the State's use of a peremptory strike in this case to dismiss [venire member] Jones constituted intentional discrimination" and violated Batson. Id. at 1270. The record evidence that compelled that finding was: (1) the explicitly racial reason for the strike of Jones; (2) the all-white jury and "the total exclusion of African-Americans [from the venire] in this county in which they comprised fifty-five percent," id.; and (3) "the strong evidence of race-based decision-making both generally and especially with respect to juror[] Jones," id.[29]

## G.    Greene v. Upton (2011)

Our recent Batson decision in Greene v. Upton, another § 2254 capital case, is also particularly instructive about state court opinion-writing. In Greene, this Court applied AEDPA deference to the state courts' denial of the § 2254

_____

to accord appropriate weight to the mitigating evidence counsel could have presented, id. at 398, 120 S. Ct. at 1515–16.

Nothing in Williams set forth any rule requiring a state court to address every claim, fact, or argument in its written opinion before AEDPA deference may apply, and indeed, the Supreme Court, when confronted with the issue, has said just the opposite. See, e.g., Johnson, 568 U.S. at —, 133 S. Ct. at 1094.

[29]The McGahee Court noted that in the post-trial proffer of race-neutral strike reasons, the prosecutor said that he used information obtained from a jury list, which included the race of venire members, and that fact "bolster[ed] somewhat the foregoing strong evidence that the prosecutor did believe that race was a significant factor." McGahee, 560 F.3d at 1270.

100

petitioner's Batson claim, even though the state courts did not address every argument made by the petitioner or make an explicit fact finding on Batson's third step. 644 F.3d at 1154–55.

In Greene's trial, the State exercised peremptory challenges against 10 venire members, 6 of whom were black. Id. at 1149. Greene lodged a Batson objection; in response, the State offered race-neutral reasons for each contested strike. Id. The state trial court determined "that the prosecutors had provided reasons for each challenge that were racially neutral." Id. at 1150.

On direct appeal, the Georgia Supreme Court affirmed Greene's convictions and death sentence. See id. at 1151. As for Greene's Batson challenge, the Georgia Supreme Court stated that it had "conducted 'a thorough review of the voir dire of each of the six prospective jurors' and determined there was 'a valid racially-neutral basis for the employment of a peremptory strike' against each." Id. (quoting Greene v. State, 469 S.E.2d 129, 135 (Ga. 1996)).

Although the state courts had determined that at Batson's second prong that the prosecutor had given race-neutral reasons for each strike, they had not made an explicit finding on step three about discriminatory intent or purpose. Therefore, petitioner Greene contended that the state trial court and the Georgia Supreme Court had unreasonably applied Batson under § 2254(d)(1) when "neither made specific fact findings about purposeful discrimination." Id. at 1155. We rejected

101

that claim, emphasizing that "Batson does not require elaborate factual findings."

Id. (citing, inter alia, Hightower II, 459 F.3d at 1072 n.9).  The Greene Court

quoted and followed Hightower II's instruction that we may "make the common

sense judgment—in light of defense counsel's failure to rebut the prosecutor's

explanations and the trial court's ultimate ruling—that the trial court implicitly

found the prosecutor's race-neutral explanations to be credible, thereby completing

step three of the Batson inquiry."  Id. (quoting Hightower II, 459 F.3d at 1072 n.9)

(internal quotation marks omitted).

Citing McGahee, petitioner Greene also contended that the Georgia Supreme

Court had unreasonably applied Batson under § 2254(d)(1) "because it did not

explicitly discuss each reason offered by the state in support of the peremptory

challenges."  Id.  This Court squarely rejected this contention, stating that

"McGahee does not stand for that proposition."  Id.  Rather, the Greene Court

observed that McGahee had determined that the state appellate court "had failed to

consider all relevant circumstances because it failed to discuss 'an explicitly racial

reason'" offered in support of the peremptory strike of a black venire member,

amid "other particularly suspicious explanation[s]."  Id. (alteration in original)

(internal quotation marks omitted).[30]

---

[30]We also observe that, unlike the situation in other cases, the state court's judgment in

The Greene Court added that, in contrast to McGahee, nothing in petitioner "Greene's record reveal[ed] that the prosecutor provided an explicitly racial reason to exercise a peremptory challenge against a juror," and the Georgia Supreme Court had implicitly "considered all relevant circumstances during its 'thorough review.'" Id. Thus, the Greene Court concluded that the Georgia Supreme Court's determination "with respect to Greene's Batson claim was not contrary to, or an unreasonable application of, clearly established federal law." Id.

## H.    Adkins v. Warden, Holman CF (2013)

Our most recent relevant Batson decision is Adkins v. Warden, Holman CF, 710 F.3d 1241 (11th Cir. 2013), which we discuss in two parts. First, we discuss the record evidence in state court that the Adkins Court recounted and relied upon to find Adkins had carried his Batson burden to show purposeful discrimination as to venire member Billy Morris. Second, while we do not quarrel with the end result reached by the majority opinion in Adkins,[31] we point out how a significant

---

McGahee could not be upheld by assuming that the state court had credited the prosecutor's reasons for his strikes. It could not be, because one of those reasons was explicitly racial and impermissible—that racially motivated reason was a poison pill that prevented an implicit finding of credibility from saving the state court judgment.

[31]We recognize that the majority opinion in Adkins concluded that the petitioner had preserved his federal Batson claim, Adkins, 710 F.3d at 1248–49, and the dissent concluded that he had not preserved his Powers claim and the Alabama courts thus had adjudicated only a state law claim as to jury selection, Adkins, 710 F.3d at 1266 (Tjoflat, J., dissenting). We do not wade into those waters, and we analyze Adkins, as the majority opinion did, as involving a preserved federal Batson claim.

103

part of the AEDPA rationale and analysis in Adkins is inconsistent with Supreme Court and our Circuit precedent.

In Adkins, the State exercised peremptory strikes against 9 of 11 black venire members and only one black juror served. Id. at 1244. In his 1988 trial, over 25 years ago, Adkins, who is white, did not object. See id. Subsequently in 1991, the Supreme Court in Powers v. Ohio, 499 U.S. 400, 111 S. Ct. 1364 (1991), held that a criminal defendant of any race may raise Batson objections. Adkins, 710 F.3d at 1244. After the state appellate court's remand, the trial court held a Batson hearing where the State gave its strike reasons. Id. at 1244–45. Several weeks later, the trial court directed the prosecutor to supplement the Batson record by affidavit with further explanation of the reason for striking black venire member Billy Morris. Id. at 1245. Later that same day, the prosecutor submitted an ex parte affidavit, explaining his Morris strike. Id.[32]

Without even awaiting a response from Adkins, the trial court entered an order the next day "finding that there was no purposeful racial discrimination in the

Further, our references in this opinion to Adkins or to the Adkins Court are all to the majority opinion in Adkins.

[32]The prosecutor's affidavit indicated that he and his co-counsel "were at all times under the impression and understood that Mr. Billy Morris was a single male and he was struck by the state for that reason." Adkins, 710 F.3d at 1245. The prosecutor's affidavit stated that his notes taken during voir dire corroborated the State's belief that Morris was single. Id. During voir dire, Morris had said he was married. Id.

peremptory strikes exercised by the State as to Billy Morris, or any other black juror struck." Id. at 1245–46. The "trial court found the prosecutor's assertion of mistaken belief as to Mr. Morris's marital status 'to be credible.'" Id. at 1246.[33] The state appellate court affirmed the trial court's denial of Adkins's Batson claim. Id. (citing Adkins v. State, 639 So. 2d 515 (Ala. Crim. App. 1993)).

In his subsequent § 2254 proceedings, Adkins appealed the district court's denial of his Batson claim. Id. Because the state trial court made explicit fact findings of no purposeful discrimination and that the prosecutor was credible, the contested issue in Adkins was not about whether explicit fact findings had to be made or whether implicit ones would suffice. See id. at 1251–55. Rather, the issues were whether the record evidence showed the state court's Batson finding of no purposeful discrimination was (1) an unreasonable application of federal law under § 2254(d)(1) or (2) an unreasonable determination of the facts under § 2254(d)(2) or both. See id. Adkins said both. The majority opinion in Adkins reviewed the state court record and concluded that "[b]ecause the [state] court overlooked material facts in its factfinding, it not only unreasonably applied Batson, it also unreasonably determined the facts at Batson's critical third step." Id. at 1254.

---

[33]The trial court's order explicitly relied upon the evidence at the Batson hearing, the prosecutor's affidavit, and the "trial court's own personal experience with the prosecutor in other cases." Adkins, 710 F.3d at 1246.

105

Importantly, the Adkins Court acknowledged that state court decisions can include both implicit and explicit rulings. It recognized that the state appellate court had "implicitly turned to Batson's first step" and had "implicitly completed Batson's second step." Id. at 1252.

But as to step three, the majority opinion in Adkins concluded that the state courts had failed to consider these five record facts: (1) "the strength of Mr. Adkins's prima facie case," id. at 1252; (2) "the fact that the prosecution explicitly noted the race of every black venire member (and only black venire members) on the jury list the state relied on in jury selection," id. (emphasis added);[34] (3) "the fact that specific proffered reasons provided by the prosecutor were incorrect and/or contradicted by the record," id.; (4) "the fact that the trial court relied upon, and did not subject to adversarial testing, an [ex parte] affidavit from the prosecutor that was submitted after the Batson hearing," id.; and (5) "the fact that the trial court relied upon facts not part of the record, such as the trial court's personal experience with the prosecutor in unrelated matters," id.

After determining that the state court decision was unreasonable, the majority opinion in Adkins conducted de novo review "unconstrained by § 2254's

---

[34]At the Batson hearing, the prosecutor's own voir dire notes were admitted into evidence. The prosecutor's notes explicitly noted the race of every black venire member, and only black venire members, marking each black venire member's name with a "BM" or "BF." Adkins, 710 F.3d at 1253.

deference." Id. at 1255 (internal quotation marks omitted).  It concluded that Adkins had "shown purposeful discrimination as to [venire member] Mr. Morris," id., based on the above five "crucial" facts, id. at 1254, plus three more: (1) "the fact that the prosecutor acknowledged at the Batson hearing that he 'was not concerned with the Batson matter . . . because it was a white-on-white crime,'" and this was an explicit acknowledgment by the prosecutor that he did not consider himself constrained by Batson in striking black venire members during trial, id. at 1256 (alterations omitted); (2) the fact that several black venire members were struck for reasons, such as because the venire member knew defense counsel, even though those reasons applied equally to white venire members who were not struck, id. at 1256–57; and (3) the fact that the prosecutor struck six black venire members on the basis of age, when those venire members' ages ranged from 31 to 86 years old and the prosecutor did not strike similarly-aged white venire members, id. at 1257–58.

To be sure, the majority opinion in Adkins pointed out plentiful and powerful evidence of racial discrimination in the state court evidentiary record that supported petitioner Adkins's federal Batson claim and the ultimate Batson result reached in Adkins.  Our disagreement is not with the end-result part of Adkins. Rather, it is with the part of Adkins about AEDPA deference.  The analysis about AEDPA deference to state court opinions, used by the Adkins majority opinion, is

107

flatly inconsistent with the well-established Supreme Court and Eleventh Circuit precedent outlined above, and we explain why that part of Adkins does not bind us or any future panels of this Circuit.

A significant part of the Adkins Court's analysis was that the state appellate court's own written opinion had failed to "mention" and thus "failed to consider" all of the relevant facts and circumstances shown in the trial record and raised in Adkins's brief on direct appeal in that state court. Id. at 1252. For example, the Adkins Court pointed out that "the Alabama Court of Criminal Appeals' entire discussion of the state's decision to strike [venire member] Mr. Morris was limited to two sentences." Id. It also concluded that there was "no indication from its opinion that the Alabama Court of Criminal Appeals considered any of the relevant circumstances bearing on the ultimate issue of discriminatory purpose." Id. (emphasis added). This was "because the Alabama Court did not even mention all the relevant circumstances brought to its attention by Mr. Adkins in his brief." Id. (emphasis added). The majority opinion in Adkins stated that "[a]lthough Mr. Adkins's brief . . . to the Alabama Court of Criminal Appeals brought . . . crucial facts to the court's attention the court did not mention or consider them." Id. at 1254 (emphasis added). The Adkins Court went on, "[t]hese are relevant circumstances that should have been considered by the Alabama Court of Criminal Appeals at Batson's third step. Instead, the Alabama Court of Criminal Appeals

108

never mentioned them." Id. (emphasis added). The Adkins Court therefore determined that the state court had "unreasonably applied Batson because it failed to consider crucial facts which Mr. Adkins raised in his brief to that court relevant to Batson's third step." Id. at 1254–55.

Under Supreme Court and our Circuit precedent, a state court's written opinion is not required to mention every relevant fact or argument in order for AEDPA deference to apply. Just the opposite is true. AEDPA deference under § 2254(d)(1) or (2) applies to summary adjudications and does not depend in any way on whether a state court opinion "mentions" or discusses a particular relevant fact or argument for purposes of § 2254(d). And we do not determine whether a state court "considered" evidence by looking to see whether the state court opinion "mentions" or "never mentioned" that evidence. The statements in Adkins about "never mentioned" or "did not mention" or about the lack of content in the state court opinion do not, and cannot, establish a new rule for state court opinion-writing in our Circuit because they are contrary to Supreme Court and our Circuit precedent outlined above.

We use the compelling record facts in Adkins as an example to illustrate how AEDPA works. First, AEDPA deference applies even if a state appellate court's opinion is short and does not discuss every fact or argument. In that event, we still examine what other "implicit findings" the state court could have made in

109

its denial of a federal claim. Even if we recognize all of the implicit fact findings that the state court could have made from the evidentiary record in favor of its decision in Adkins's case, and credit every reason the prosecutor gave, that decision would not be a reasonable application of Batson or a reasonable determination of the facts. Even if we were to indulge every maximum factual inference from that evidentiary record and credit every reason given, it would not be good enough to make the no-discrimination ruling reasonable. In our view and under Supreme Court and our precedent, the strong evidence of discriminatory purpose recited from the state court record in Adkins is what makes the state court's Batson decision there unreasonable, not the quality or length of the state appellate court's findings, explanations, or opinion-writing in that case.

For all these reasons, we reject Lee's claim that the state appellate court's decision is an unreasonable application of Batson because it did not explicitly mention his allegation of a jury-discrimination history and did not make an explicit credibility finding on Batson's third prong. We now address Lee's other unreasonable-application arguments.

## X. BATSON ANALYSIS IN LEE'S CASE

In this appeal, Lee focuses on three things as demonstrating that the state appellate court's decision was an unreasonable application of Batson: (1) the State's striking pattern; (2) the district attorney's office's alleged racial

110

discrimination history in jury selections; and (3) the State's strike reasons for venire members David Gutridge and Demond Martin. Our careful review of the state court record and the state appellate court's decision leads us to conclude that the state appellate court did not unreasonably apply Batson within the meaning of § 2254(d)(1).[35] We address each of Lee's arguments in turn.

## A.    Striking Pattern

The State used all of its 21 peremptory strikes and 17 of its 18 cause strikes on black venire members. The State's striking pattern is troubling, although not alone dispositive of Batson's third step.

Rather, in the statistical analysis courts must consider the statistics in the context of other factors in a case, such as: the racial composition of the venire from which the jurors were struck, the racial composition of the ultimate jury, the substance of the voir dire answers of jurors struck by the State, and any other evidence in the record of a particular case. Indeed, "the number of persons struck takes on meaning only when coupled with other information such as the racial composition of the venire, the race of others struck, or the voir dire answers of those who were struck compared to the answers of those who were not struck."

---

[35]The State does not claim that the state appellate court procedurally barred any aspect of Lee's Batson claim. But the State does contend that certain arguments Lee has made in the federal courts were not raised in the state courts and cannot be made here. We disagree and conclude that Lee adequately raised in the state appellate court the claims he made in the district court and now here.

See United States v. Ochoa-Vasquez, 428 F.3d 1015, 1044 (11th Cir. 2005) (internal quotation marks omitted); see also Cochran v. Herring, 43 F.3d 1404, 1412 (11th Cir. 1995) (stating that "statistical evidence is merely one factor which the court examines, and it is not necessarily dispositive" in evaluating whether a Batson violation has occurred).

Here, as to the voir dire answers, the state appellate court examined them and determined that the prosecutor's strike reasons were all race-neutral. The state appellate court compared the answers of the struck venire members to the answers of seated jurors whom Lee claimed on direct appeal were similarly situated and concluded that there was no disparate treatment. Lee I, 898 So. 2d at 815–17. There is nothing in the substance of the voir dire itself that evinces discriminatory intent.

The racial composition of the venire and the selected jury should also be considered. Before peremptory strikes began, 32 of the 53 remaining venire members were black or 60.3% of the venire. Yet on Lee's jury, 9 of the 12 jurors were black or 75% of the jury. That a predominantly black jury was selected cuts in favor of the state appellate court's conclusion that no Batson violation occurred. See United States v. Puentes, 50 F.3d 1567, 1578 (11th Cir. 1995) ("Although the presence of African-American jurors does not dispose of an allegation of race-based peremptory challenges, it is a significant factor tending to prove the paucity

112

of the claim."); see also, e.g., United States v. Gamory, 635 F.3d 480, 496 (11th Cir. 2011) (in addition to finding prosecutor's proffered race-neutral reason persuasive, the Court specifically noted that three African-Americans were ultimately seated on the jury).

It was not unreasonable for the state appellate court to conclude that this striking pattern, which also produced a predominantly black jury, was not a per se violation under Batson. Of course, it must be considered in the totality of all other relevant circumstances, which we discuss too.

**B.      Alleged Racial Discrimination History**

Lee also alleges that a history of racial discrimination in jury selections by the district attorney's office demonstrates that the State was motivated by race in the jury selection. Lee's hurdle here is that his trial counsel did not introduce, or even proffer, any evidence in the trial court to support that allegation. Rather, all trial counsel did was cite the single case of "Robert Thomas v. State." In that case, however, the state supreme court did not find a Batson violation, but remanded the case for further proceedings. Ex parte Thomas, 601 So. 2d 56, 58–59 (Ala. 1992). We review Ex parte Thomas to show exactly what happened there.

In Ex parte Thomas, the same district attorney's office used 8 of its 11 peremptory strikes against black venire members, stating they had misdemeanor convictions and/or bad driving records, based on a document prepared by a state

113

investigator.  Id. at 57.  The trial court sustained the State's objection to producing the document and overruled the defendant's Batson motion.  Id.  The Alabama Supreme Court reversed and remanded, concluding that the trial court erroneously "accepte[d] at face value the State's ostensibly facially neutral explanations for the use of its peremptory challenges, which were, with regard to three of the black veniremembers who were struck, based exclusively on information contained in the document to which only the State had access."  Id. at 58 (emphasis added).

The Alabama Supreme Court noted in Ex parte Thomas that it "might be in a position to affirm" had, inter alia, the state trial court "ordered the State to produce the document that it used in exercising its peremptory challenges."  Id. at 59.  The Alabama Supreme Court did not find a Batson violation, only that the defense was entitled on remand to "an opportunity to prove that the seemingly facially neutral explanations offered by the State were a sham or pretext."  Id. at 58.

In Lee's case, by contrast, prosecutor Greene turned over to Lee's trial counsel the venire members' criminal histories.  If anything, Ex parte Thomas helps the State here, because Lee's counsel had the criminal histories but never disputed the credibility of the prosecutor's arrest-record reason for striking venire members Demond Martin, Alice Scott, and Johnnie Hall.

Similarly, in his state direct appeal brief, Lee's appellate counsel did not proffer any evidence either.  Lee's counsel did cite two Alabama cases prosecuted

114

by the same district attorney's office where the same Alabama appellate court reversed based on a Batson violation.  See Kynard v. State, 631 So. 2d 257, 261–70 (Ala. Crim. App. 1993) (although venire was 35% black, the jury had 10 white jurors and 2 black jurors, or was only 17% black); Duncan v. State, 612 So. 2d 1304, 1307–11 (Ala. Crim. App. 1992) (jury composition not noted).  Lee's appellate counsel cited one case in which the Alabama appellate court affirmed, albeit concluding that the trial court had correctly seated a black juror the State struck.  See Marks v. State, 581 So. 2d 1182, 1186–87 (Ala. Crim. App. 1990) (jury composition not noted).

What Lee ignores is that the trials in Kynard, Duncan, and Marks occurred at least a decade before Lee's trial and shortly after Batson was decided.[36]  In both Kynard and Duncan, the state appellate court found the State's strike reasons were either not supported by the record or were pretextual based on the State's failure to strike white venire members for the same reasons or both.  In contrast, in Lee's case that same Alabama appellate court found the prosecutor's strike reasons were race-neutral, supported by the record, and not pretextual due to disparate treatment.

---

[36]Specifically, in Kynard, the offense occurred on September 2, 1988, 631 So. 2d at 258–59, and the appeal was docketed in 1990 (appeal number 90-320), which shows the trial occurred between 1988 and 1990.  In Duncan, the offense occurred on October 11, 1987, 575 So. 2d 1198, 1199 (Ala. Crim. App. 1990), and the first appellate decision was on August 3, 1990, which shows the trial occurred between 1987 and 1990.  In Marks, the offenses occurred between February and March of 1982, 581 So. 2d at 1183, and the appeal was docketed in 1989 (appeal number 89-410), which shows the trial occurred between 1982 and 1989.

115

As the State points out, it is telling that, in his direct appeal, Lee cited only a handful of reversals out of the thousands of cases prosecuted by this district attorney's office, which prosecutes cases in five Alabama counties. We cannot say these few cases where the trials occurred more than a decade before Lee's trial establish that the prosecutor's peremptory-strike reasons in Lee's particular case were pretextual and discriminatory.[37]

Before the state appellate court, Lee focused his arguments on the State's strikes of seven black venire members. As recounted above, the state appellate court considered Lee's arguments in light of the record and concluded that the State's strike reasons for those seven venire members were supported by the record and did not demonstrate disparate treatment. In this appeal, although Lee continues to claim the State's strikes against each of the 21 black venire members violated Batson, Lee's brief before us focuses primarily on only two venire members, David Gutridge and Demond Martin, and thus we discuss them in more detail.

---

[37]In his direct appeal, Lee also cited three cases where the Alabama courts found no Batson violation. Stephens v. State, 580 So. 2d 11 (Ala. Crim. App. 1990) (seven white jurors and five black jurors on jury in a 1987 trial); McGahee v. State, 554 So. 2d 454 (Ala. Crim. App. 1989) (all-white jury in a 1986-1987 trial); and Currin v. State, 535 So. 2d 221 (Ala. Crim. App. 1988) (70% black jury in 1987 trial). These three trials occurred at least 13 years before Lee's 2000 trial. As discussed, in 2009, this Court concluded that the defendant in McGahee was entitled to § 2254 relief. Although we have previously discussed McGahee, we also distinguish it factually from Lee's case later.

116

## C.    Venire Member David Gutridge

At Lee's trial, the prosecutor stated that David Gutridge was struck because he: (1) opposed the death penalty; (2) was uncooperative in his answers to the prosecutor's questions; and (3) had a family member convicted of a property crime. Lee I, 898 So. 2d at 813. Lee argues that the first and second reasons were false. At the outset, the state appellate court agreed that the prosecutor had mistakenly asserted that Gutridge opposed the death penalty. Id. at 815. The court remarked that a mistaken reason could support a peremptory strike so long as it was "based on an honest belief" and otherwise represented a race-neutral reason. Id. at 815–16 (internal quotation marks omitted). The court examined the record and concluded that "[t]he record does not indicate that the prosecutor's reason was not based on an honest belief." Id. at 816. The conclusion that an honestly mistaken but race-neutral reason for striking a black venire member did not violate Batson was not unreasonable.

Concerning the prosecutor's second reason, that Gutridge was uncooperative, the state appellate court reiterated that demeanor is a race-neutral reason for exercising a peremptory strike and that Lee at trial "did not dispute the prosecutor's assertions about the demeanor" of Gutridge. Id. The trial record supports that fact. Additionally we note, as the voir dire transcript shows, that Gutridge did not raise his hand to answer either of the prosecutor's questions about

117

whether panel members could impose the death penalty, and only after being singled out did Gutridge answer specifically whether he could impose it.

The third reason the prosecutor struck Gutridge was because he had a "[f]amily member involved and convicted of a property crime." During voir dire, the prosecutor asked if any venire member or a family member had been arrested and charged with a property crime. Gutridge was one of the prospective jurors who raised his hand to this question. The record thus supports this reason too.

Lee also compares Gutridge with a white venire member, Edwin Ember, who answered the same question about a property crime in the affirmative but was not struck by the State. Notably, Ember did not sit on Lee's jury. The state appellate court examined the record and found that Lee's defense counsel had used his 12th peremptory strike on Ember, seven strikes before the State used its 19th strike on Gutridge. The court concluded that "[b]ecause the defense had long since struck veniremember [Ember] when the State struck veniremember [Gutridge], we do not find that there was any plain error in this regard." Id. at 817. Additionally we note Ember was not similarly situated to Gutridge for yet another reason supported by the record. Ember immediately raised his hand to the question of whether he would impose the death penalty if it were the proper penalty. Ember, unlike Gutridge, was not reluctant to answer.

## D.    Venire Member Demond Martin

118

Lee contends that the state appellate court should have examined the two reasons given for striking Demond Martin, discovered that they were false, and concluded the strike was racially motivated. At trial the prosecutor had stated he struck Martin because: (1) Martin was opposed to the death penalty; and (2) he had "a bit of an arrest record."

The record supports the first reason. While Martin said that he could impose the death penalty under certain circumstances, he also told the prosecutor, "I don't like the death penalty, I'm against it." Like Gutridge, Martin also failed to raise his hand when the prosecutor asked the members of his voir dire panel if they felt death could be "a proper penalty given the circumstances," and he had to be individually prodded by the prosecutor to disclose his views on the death penalty.

Lee also now challenges the second reason, that Martin had a "bit of an arrest record," as unsupported by the record. In Lee's direct appeal, Lee made, and the state appellate court examined, a more general argument that the prosecutor's reason for striking several black venire members (including Alice Scott and Johnnie Hall) due to their arrest records was not supported by the record. Lee I, 898 So. 2d at 816. The court observed that the prosecutor had documentation concerning the criminal histories of each of the venire members. Id. Before the parties made cause or peremptory challenges, the State provided the defense with a copy of the criminal histories of the venire members. Id. Yet, Lee's trial counsel

119

did not contest the facts relating to the arrest record of any venire member for whom the prosecutor cited an arrest record as a reason for the strike. The court thus concluded that Lee's contention—that the arrest record reason was pretextual—was "not supported by the record," and found no plain error. Id. This conclusion is not unreasonable. At no time has Lee submitted any evidence to refute the prosecutor's statement that Martin, plus Scott and Hall, had arrest records.

### E.    Totality of the Evidence

In sum, courts should consider all relevant circumstances in determining if a Batson violation occurred. Batson, 476 U.S. at 96, 106 S. Ct. at 1723; see also Johnson, 545 U.S. at 170, 125 S. Ct. at 2417; Miller-El, 545 U.S. at 240, 125 S. Ct. at 2325. We have examined the voir dire answers, the State's strike reasons as to the contested venire members, and every fact or argument proffered by Lee to support his Batson claim. After doing so, and given our highly deferential AEDPA review, we conclude that the state appellate court did not unreasonably apply Batson to the facts here, i.e., all relevant circumstances in Lee's case, and its decision is entitled to deference.[38]

_____

[38]In his briefs to this Court, Lee makes only passing references to 28 U.S.C. § 2254(d)(2) and a conclusory contention that the state courts unreasonably determined the facts. The thrust of Lee's argument is that the state courts failed to follow Batson's third step and unreasonably applied clearly established federal law. Thus, Lee's claim is more appropriately analyzed under

120

Although Lee contends that there are factual parallels between his case and McGahee and Adkins, our recitation of the facts in those cases already demonstrates how materially and starkly different the evidence was in those cases from Lee's. If anything, the evidentiary differences between this case and McGahee show how weak Lee's Batson claim is. Lee's jury was not all white but was 75% black, with nine black jurors and three white jurors. In Lee's case, each of the prosecutor's reasons for the strikes was race-neutral and supported by the record. There was no explicitly racial reason for striking any black venire member. No state court's reasoning, given in its own opinion in Lee's case, revealed that the court did not consider an explicitly racial reason for a venire member strike. No prosecutor gave a "low intelligence" reason historically tied to racism.

The record evidence in Lee's case is also nothing like Adkins, where only one black juror served. In Lee's case, there is no jury list with racial notations by the prosecutor. There is no prosecutor admitting he did not consider any Batson restraints in striking black prospective jurors. There is no ex parte affidavit by the prosecutor about strike reasons. There is no augmented record, assembled well after the original trial, with extensive objections by trial counsel. There is no evidence of black venire members struck for age or answers where white venire

_____

§ 2254(d)(1). McGahee, 560 F.3d at 1256 ("Where the concern is that a state court failed to follow Batson's three steps, the analysis should be under AEDPA § 2254(d)(1) . . . ."). In any event, Lee has not shown an unreasonable determination of the facts under § 2254(d)(2).

121

members with the same age or the same answers were not struck.  Rather, in Lee's case, the prosecutor's race-neutral reasons for the struck venire members were largely not objected to at trial, and were supported by the trial record.  Lee has failed to show any Batson violation.

## XI. CONCLUSION

For the reasons set forth above, we affirm the district court's denial of Lee's § 2254 petition.

**AFFIRMED.**

122

TJOFLAT, Circuit Judge, specially concurring:

I concur fully in the court's opinion and write separately to add another reason for the affirmance.

In this case, Lee timely raised a <u>Batson</u>[1] claim in the state trial court, objecting to the State's exercise of peremptory challenge—at the end of the voir dire of the venire and after the jury had been struck—against twenty-one black venirepersons. The court ruled that Lee had established a prima facie case of racial discrimination and required the State to respond. The District Attorney responded with race-neutral reasons for each of the State's challenges. Lee had no fault with the reasons the District Attorney gave for twenty of the challenges, effectively agreeing that he had lawful reasons for exercising them. As for the remaining challenge, the one lodged against Kevin Stevens, Lee disagreed, contending that it was racially motivated. He expressed his contention thusly: "The District Attorney gave the reason being [Stevens is] going to be in child support court. There is no indication that there's any problem with him being in child support with any animosity towards the District Attorney's Office or him going to court. The mere fact that he's appeared in court is no reason why he should be struck from the jury." Maj. Op. at 67. The District Attorney, in reply, explained that his

---

[1] <u>Batson v. Kentucky</u>, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986).

office prosecuted child support cases and "[u]nfortunately that tends to create some difficulty with defendants that come before the Court. They feel somehow we're prosecuting them for a crime." Maj. Op. at 68. Lee let the explanation stand; that is, he did not contend that the District Attorney's explanation was a pretext for racial discrimination. The court overruled Lee's specific objection to the Stevens challenge and the twenty other challenges as well.

In his appeal to the Alabama Court of Criminal Appeals, Lee asked the court to notice plain error and sustain his Batson objections. That is, he did not claim that the trial court had erred in overruling his objections. Rather, he argued that had the trial court considered the representations he advanced in his brief, the trial court would have found the District Attorney's reasons for exercising the twenty-one peremptory challenges a pretext for racial discrimination. The Court of Criminal Appeals, being bound by Rule 45A of the Alabama Rules of Appellate Procedure[2] to notice plain error in this capital case, entertained Lee's Batson arguments. It gave him a second bite of the apple; it allowed him to present Batson objections he had withheld from the trial court. In doing so, the court

---

[2] Rule 45A, "Scope of review in death cases," states:
In all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant.

124

litigated <u>Batson</u> claims that <u>Batson</u> and its Supreme Court progeny would not have entertained.

The Alabama Court of Criminal Appeals did precisely what the Alabama Supreme Court did in <u>Ex Parte Adkins</u>, 600 So. 2d 1067 (Ala. 1992). There, in the trial court, the defendant, Adkins, stood silent when the State peremptorily challenged blacks on the venire. Instead, he waited until he was before the Alabama Supreme Court on direct appeal before objecting. Invoking Rule 45A, the Supreme Court entertained his objection and remanded the case to the Court of Criminal Appeals with the instruction to remand the case to the trial court for a full blown <u>Batson</u> hearing. On remand, Atkins failed to establish that the State's peremptory challenges were racially discriminatory, and the Alabama Court of Criminal Appeals affirmed. <u>Adkins v. State</u>, 639 So. 2d 515 (Ala. Crim. App. 1993). This court found the alleged discrimination and granted habeas corpus relief. <u>Adkins v. Warden, Holman CF</u>, 710 F.3d 1241 (11th Cir. 2013). As I pointed out in dissenting, nothing in <u>Batson</u> or its progeny recognizes a <u>Batson</u> claim presented for the first time on appeal. <u>Id.</u> at 1261–62 (Tjoflat, J., dissenting).

125

To be cognizable, a <u>Batson</u> claim must be presented to the trial court prior to the empanelment of the jury; if not presented then, the claim is non-existent.[3]

The only difference between the <u>Adkins</u> scenario and the scenario this case presents is that, here, the defendant did object to the State's peremptory challenges at trial; whereas in <u>Adkins</u>, the defendant did not. Thus, the narrow question this case presents is whether, because the defendant lodged a <u>Batson</u> objection at trial, he may augment his objection on appeal with an argument he failed to present to the trial court, to-wit: that the State's reasons for its challenges were a pretext for discrimination. In other words, had the trial court focused on evidence the record contained—but the defendant neither mentioned nor relied on in pressing his <u>Batson</u> objections—the trial court would have found that the reasons the State gave for challenging the black venirepersons were mere pretext for racial discrimination. Three of our sister circuits have answered this question. If, after the State has come forth with non-discriminatory reasons for exercising the peremptory challenges at issue the defendant stands silent, the defendant waives his <u>Batson</u> objection; he may not resurrect it on appeal. See <u>Davis v. Baltimore Gas & Elec. Co.</u>, 160 F.3d 1023, 1027 (4th Cir. 1998) ("[T]he movant's failure to argue pretext

---

[3] A policy allowing the initiation of a <u>Batson</u> claim on appeal rather than at trial would lead to the type of sandbagging that procedural rules, like the contemporaneous objection rule, seek to avoid. See <u>United States v. Pielago</u>, 135 F.3d 703, 709 (11th Cir. 1998) ("The contemporaneous objection rule fosters finality of judgment and deters 'sandbagging,' saving an issue for appeal in hopes of having another shot at trial if the first one misses.").

126

constitutes a waiver of the initial [Batson] objection."); Hopson v. Fredericksen, 961 F.2d 1374, 1377 (8th Cir. 1992) ("We hold that [appellant] failed to properly preserve this issue for appeal. After the trial judge listened to [appellee's] reasons for striking the black venireman and requested the jury to return, [appellant] did not object nor request the trial judge to articulate her reasons on the record for overruling the Batson objection. Nor does the record show that [appellant's] counsel made any attempt to rebut the reasons advanced by Fredericksen's counsel when given the opportunity to do so."); United States v. Rudas, 905 F.2d 38, 41 (2d Cir. 1990) ("Once the Government has offered reasons for its peremptory challenges, defense counsel must expressly indicate an intention to pursue the Batson claim. Here defense counsel did nothing. . . . By failing to dispute the Government's explanations, she appeared to acquiesce to them. As a result, there was no need for the district judge to make a ruling.").

I fully concur in the court's affirmance of the District Court's decision denying habeas relief. I also do so because Lee failed to show on direct appeal to the Alabama Court of Criminal Appeals that the trial court erred in denying his Batson objections. Because the State, in its brief in the instant appeal, has treated the Alabama Court of Criminal Appeals, in its plain error review, as having reviewed what Lee argued to the trial court (but did not) in making his Batson objections, I agree that Court of Criminal Appeals decision is neither contrary to,

127

nor an unreasonable application of, the United States Supreme Court's <u>Batson</u>

holdings.